### ELIJAH GUFFEE v. THE STATE.

1. MURDER — CHARGE OF THE COURT. — In a trial for murder, the *corpus delicti* and the agency of the defendant in firing the fatal shot were established by the concurrent testimony of witnesses, who further proved that the homicide was the concluding incident of a *rencontre* which, originating in a difficulty between the defendant's brother and the deceased, in the defendant's absence, resulted in the deceased killing the defendant's brother and being instantly shot down by the defendant. But in the circumstances preceding and attending the *rencontre* there were such discrepancies in the testimony as might, on the one hand, have warranted the acquittal of the defendant on the ground of self-defence, or, on the other hand, his conviction for murder in either degree or for manslaughter. *Held*, that this state of case made it incumbent on the court to give in charge to the jury the law applicable to every deduction they might draw from the evidence.

2. MURDER IN THE FIRST DEGREE. — If the homicide was the consummation of a preconceived conspiracy and coöperation between the defendant and his brother, it was murder in the first degree.

3. SAME. — Or if the defendant, without preconcert with his brother, but in resentment of the difficulty pending between his brother and the deceased, did, with sedate and deliberate mind, form the design to slay the deceased, and in pursuance thereof proceeded to the scene of the difficulty, and, without fresh provocation, executed his design by killing the deceased

his offence was murder in the first degree, irrespective of what transpired between his brother and the deceased in the course of the difficulty.

4. Same. — Or if the defendant's brother brought on the difficulty with express malice and with intent to kill or seriously injure the deceased, and the defendant, when apprised of the difficulty, went to the scene; and, know-ing the unlawful purpose of his brother, aided him in its prosecution, or encouraged him therein by words or gestures, and the deceased was killed in its progress, then the defendant was as culpable as his brother, and the homicide was murder in the first degree.

5. Murder in the Second Degree. — If, however, the defendant's brother brought on the difficulty without express malice, but in sudden passion without adequate cause, and in its progress conceived the purpose to slay the deceased, and the defendant, incited by like passion at seeing his brother engaged in the difficulty, joined in the latter's purpose, and aided or encouraged him in its prosecution, and the deceased was slain therein, the defendant's brother, had he survived, would have been guilty of murder in the second degree, and the defendant could not have been guilty of a higher degree.

6. Same. — Or if, without preconceived design against the deceased, the defendant, on learning of the danger threatening his brother, went to his relief with the sole purpose of averting his danger, and without intent to take part in any unlawful attack upon the deceased, and, after he had arrived at the scene of the difficulty, his brother, without defendant's complicity, renewed the difficulty and was killed by the deceased, and thereupon the defendant, actuated by revenge and not by sudden passion, conceived and instantly executed the design of killing the deceased, his offence was murder in the second degree.

7. Same. — Or if the defendant, after reaching the scene of the difficulty, and after its renewal by his brother and the deceased, and without complicity in any wrongful act or purpose of his brother, conceived the design of killing the deceased in case the deceased should kill or injure his brother, and such design was not that of a sedate and deliberate mind, and, without sufficient cooling-time between its conception and execution, he carried it into effect in consequence of the killing of his brother, his offence was not of a higher grade than murder in the second degree.

8. Manslaughter — Adequate Cause. — It is well settled that, to excite the sudden passion which mitigates culpable homicide from murder to manslaughter, there may be other "adequate causes" besides those instanced in the Penal Code. If in one's presence his brother be killed, this may constitute such adequate cause, provided they were not jointly engaged in some unlawful act.

9. Same. — Or if the defendant in this case, without malice at the deceased, and in ignorance of any unlawful design of his brother against the deceased, but expecting a necessity for his interference to protect his brother from death or serious bodily injury at the hands of the deceased, fired upon the deceased when the latter shot or was in the act of shooting

his brother, his offence was not of a higher grade than manslaughter, notwithstanding his brother may have brought on the conflict with malicious intent.

10. SAME. — Or if the deceased, after once firing upon the defendant's brother, immediately prepared his pistol with apparent intent to fire at him again, and the defendant, without fault or negligence on his part, and with the sole and honest purpose of protecting his brother, immediately shot and killed the deceased, his offence could not be greater than manslaughter.

11. JUSTIFIABLE HOMICIDE. — If the deceased, before the defendant took any part in the difficulty, shot the defendant's brother and then cocked and presented his pistol at the defendant, with the apparent intention of shooting him, the defendant's right of self-defence justified him in immediately firing upon and killing the deceased.

12. SAME. — Or if the deceased and the defendant's brother were separated, and thereupon the latter abandoned all hostile design against the former, and did and said nothing indicative of an intent to renew the difficulty, and the deceased, without new provocation, drew his pistol and indicated an immediate purpose to shoot the defendant's brother, then the latter had the right to defend himself in any necessary manner, even by stabbing the deceased; and if at this juncture the defendant, without previous connection with the difficulty, shot· and killed the deceased to save his brother's life, and such action appeared reasonably necessary for that purpose, then the defendant was also justifiable, even though his action failed to save the life of his brother.

13. INTENT. — If one, knowing the unlawful intent of another, joins him in the commission of an offence, both are principal offenders, no matter what degree of consanguinity or what relation exists between them. But if one brother, finding another engaged.in an affray, goes to his aid and takes part in the conflict, his amenability to the law is dependent upon his own acts and intent, and not upon the intent with which his brother, without his knowledge, engaged in or prosecuted the difficulty.

14. BURDEN OF PROOF. — It is never incumbent on a defendant to show mitigating facts unless they fail to appear from the evidence adduced against him, nor unless the evidence for the State has made a *primâ facie* case of guilt beyond a reasonable doubt.

APPEAL from the District Court of Johnson.    Tried below before the Hon. J. ABBOTT.

Elijah Guffee, the appellant, was charged in the indictment with the murder of Mike Dixon, on November 29, 1878, by shooting him with a gun.   The jury found him guilty of murder in the first degree, and assessed his punishment at confinement in the penitentiary for the term of his natural life.

Cleburne, the county-seat of Johnson County, was the scene of a tragical affray which occurred between sunset and dark of the 29th of November, 1878, and resulted in the almost instant death of two out of the three actors engaged in it, the subsequent prosecution of the survivor, his conviction of murder in the first degree, and his present appeal therefrom. John Guffee, an elder brother of the appellant, fell before the pistol of Mike Dixon, who, within the next minute, received from a Winchester rifle fired by the appellant a wound of which he died in about two hours. The appellant was the proprietor of a saloon upon the west side of the public square, and Dixon was connected with the establishment either as a partner or an employee. Until the difficulty which resulted so disastrously for all concerned, they had been upon terms of the most intimate friendship.

There were many eye-witnesses of the encounter, and in the facts already related their testimony entirely concurred. But in respect of the circumstances immediately preceding it, and the incidents of its progress, brief as was its duration, their narratives, though unusually free from actual conflict, are replete with circumstantial discrepancies, springing doubtless from their different stand-points and the prevailing excitement, and resulting in a series of accounts from which, according to the preference assigned them, may be deduced a remarkable variety of conclusions, reaching from murder in the first degree upon the one extreme to justifiable homicide in self-defence upon the other. This testimony is far too elaborate for a full insertion, and an attempt at a condensation of it could scarcely preserve the distinctive characteristics of the several versions given by the numerous witnesses. Enough of it, however, may be reproduced to subserve all practical purposes, premising that the drug-store which was the scene of the conflict adjoined the saloon of the appellant, and that he and his brother John, with their families, lived in the same house, and about three hundred yards from the saloon and

the drug-store. It appears that the appellant had left the saloon and gone to his home an hour or two before the *rencontre*, and, inferentially, that nothing had then transpired to forecast the tragedy. It appears, also, by the testimony of a State's witness, that within a very few minutes before the *rencontre* he saw the defendant, with a gun in his hand, going hurriedly towards the saloon and the drug-store from the direction of his house, and that a little further on he (the witness) met John Guffee going hurriedly towards his house from the direction of the saloon and the drug-store. The witness, however, thought that the defendant and his brother did not meet each other, as they seemed to have taken different streets; nor was there any proof that they met until they got together in the presence of Dixon, the deceased. On the contrary, the evidence even for the prosecution tended to show that they could not have met.

B. D. Simpson, testifying for the State, said that he first observed Dixon standing in the front door of Durham & Mabry's drug-store, and the defendant standing near by with a gun in his hand. The defendant said, " Mr. Dixon, what is all this about? What is my house shut up about? What did you draw a pistol on John Guffee for, and he unarmed? I want my door opened." Dixon replied, " I have got no key to open it." The defendant then said, " You are a coward, and won't fight anybody." Then Dixon asked the defendant if he came there to fight him, and the defendant replied, ".I have come to fight anybody." The deceased said, " If you want to fight me, shoot away." Soon afterwards John Guffee came up, and immediately caught Dixon by his coat and said, " If you don't eat your words, I will cut your throat." Mr. Robinson tried to take the knife out of John Guffee's hand, but was told by John Guffee to turn him loose or he might get accidentally cut. John Guffee pulled Dixon out on the sidewalk, and was pulling him about, when witness told him to turn Dixon loose,

and then the defendant told him the same thing, and he did turn him loose; whereupon Dixon stepped into the drug-store. While this was passing, the witness heard the defendant tell Dixon to shoot John Guffee and that then he (the defendant) would shoot him (Dixon); and the witness thought the defendant also told John Guffee to kill Dixon. The testimony of this witness, as it appears in the record, does not give in detail the occurrences after John Guffee took his grasp off of Dixon and the latter stepped into the door of the drug-store. It shows, however, that John Guffee seized Dixon a second time, who, saying, "If it must go, it goes," or something to that effect, shot John Guffee with a pistol, and was himself immediately shot by the defendant with his gun. The witness assisted in lifting Dixon from the floor to the counter of the drug-store, and heard him then say, "They have murdered me,"— a remark to the admission of which the defence objected, but which was admitted over the objection, and an exception reserved. John Guffee, according to this witness, was twenty-five or thirty pounds heavier than Dixon.

B. L. Durham, for the State, testified that Dixon was standing in the front door of the drug-store, when the defendant came up and said, "I have come to settle that difficulty." Dixon said, "What difficulty, and how do you want to settle it? If you want to fight me, dart your harpoon." Defendant then said, "I have the nerve to kill a man and laugh," and was laughing when he said this. Witness heard Dixon say, "Let us have a settlement by the books," and some one, other than the defendant, replied that this was no time to have a settlement. This witness did not see John Guffee until the latter, with a pocket-knife open in his hand, collared Dixon and, while flourishing his knife around Dixon's face and throat, told him he had to take back what he had said, — that he had called him (John Guffee) a son of a bitch. Dixon said he had not done it, and had nothing to take back. The de-

fendant told John Guffee to turn Dixon loose, and John did so. Witness, thinking the difficulty was over, turned to talk to somebody, and John Guffee ran up and caught Dixon again, and then the shooting took place. Witness could not tell whether Dixon or the defendant first cocked their weapons, but the two shots by which Dixon killed John Guffee and was himself killed by the defendant were almost instantaneous.

It being in proof that the defendant, immediately after the shooting, ran off in the direction of his house, the State introduced John C. Brown, the sheriff of the county, who testified that he was across the public square from the drug-store when he heard the shots, and immediately started in that direction, but was met and told that John Guffee and Dixon had been killed and that the defendant had fled towards his house. Witness ordered two of his deputies to get horses for the pursuit, and then ran to the premises occupied by the defendant, and, saddled and hitched to the fence in the rear, he found a horse which he had previously seen in the possession of the defendant. The defendant himself was subsequently found in the cellar of a brewery which stood in the same enclosure as his house. He said he was afraid of Dixon's friends, but would surrender and come out if witness would disperse the crowd. He was armed with a knife and a gun; and, after remaining in the cellar for about an hour and a half, he came out and surrendered to the witness, who had dispersed the crowd in the meantime.

The testimony already related presents, perhaps, the most unfavorable phase of the case for the defendant. An exhibit now of the most favorable one will suffice, with the remark that numerous witnesses of whom no explicit mention is made bore testimony which, while disclosing little or no direct conflict with that of the rest, imparts to the case a variety of bearings more or less adverse or favorable to the defendant. In their versions of the altercation or con-

versation between the defendant and Dixon there is more diversity than in their descriptions of the conflict itself. Some of them avowed their inability to repeat all that was said, and it is inferable there was much more than appears in the evidence.

W. Lockett, a State's witness, testified that at a distance of about a hundred yards he heard quarrelling going on near Durham & Mabry's drug-store, and went over there to see who were quarrelling and what was the matter. When he got there he found that it was the defendant and Mike Dixon, the deceased, who were quarrelling. John Guffee was not then there. The first thing heard by witness was the defendant say to the deceased, "You have had a difficulty with John Guffee, and I have come to settle it." Deceased asked the defendant how he wanted to settle, and the defendant replied, "Any way." Finally it was agreed to settle by the books; the deceased proposed it. The defendant stated that he did not have the key, and the deceased said he could kick the door open, and started to do so, but did not. Some person in the crowd (not the defendant) said it was no time to settle by the books, and then the deceased turned and went to the north door of the drug-store and stood in it, leaning against the column between the two front doors. The defendant was armed with a Winchester rifle. The deceased, standing in the door, said, "If we can't settle by the books, we can settle in some other way," and put his hand on his pistol, which he had in the waistband of his pants. He did not then draw his pistol, but said, "If you want to fight me, dart your harpoon." About that time John Guffee came up and caught the deceased around the neck. He had an open pocket-knife in his hand, and waived it around the face and throat of the deceased, telling him he must take back something he had said to him (John Guffee). Deceased replied that he had nothing to take back. They got out on the sidewalk in front of the drug-store, and the deceased kept telling John

Guffee to turn him loose; whereupon the defendant made John Guffee turn the deceased loose, and the latter stepped back into the door of the drug-store. John Guffee again caught hold of the deceased, who, saying, "If it must go, it goes," or something to that effect, immediately fired his pistol at John Guffee, and the defendant, as quickly as possible, raised his gun and fired, and then, without hesitating, ran up the street. Before John Guffee and the deceased got out on the sidewalk, and before the defendant made John turn the deceased loose, the defendant said to the deceased, " Shoot him Mike, and I'll shoot you, and we will all go to hell together." The defendant did not have his gun up, but had its muzzle hanging down.

On his cross-examination, the witness stated that it was the habit of the deceased, the defendant, and John Guffee to talk to each other so roughly that any one else would think they were about to fight. It was the defendant's habit to stop John Guffee when the latter was in a difficulty, by talking roughly to him, and by telling him he was no account and ought to be whipped. When the deceased said " dart your harpoon," he cocked the pistol which he had in the waistband of his pants, and the defendant did not until then cock his gun. They then cocked about the same time. The last words spoken by the defendant before the shooting were to tell John Guffee to turn the deceased loose. When the deceased's pistol fired, John Guffee put his hands on his stomach and said, " I am killed." The defendant had opportunity and could have shot the deceased before he did, if he had chosen to do so. There was considerable excitement, and the whole difficulty occurred very suddenly and within a very few minutes.

Tom Owens, a witness for the defence, testified that he stood by the side of the defendant, and that they were both in a position to see what Dixon did. Dixon and John Guffee had each other by the hand, the latter holding a knife in his. The defendant told Dixon to shoot John Guffee, —

that he was no account.   The last remark by the defendant previous to the shooting was to tell John Guffee to turn Dixon loose and to put up his knife, and for Dixon to put up his pistol.   When John Guffee was shot, the defendant had his gun in one hand, hanging down by his side. Dixon, saying "If it goes, it goes," fired, and John Guffee slapped his hands on his stomach and exclaimed, "I am a dead man," and then Dixon had his pistol cocked and pointed towards the defendant, who was standing where he could see it, and who instantly threw up his gun with the one hand and shot Dixon.   After Dixon fell, witness helped to pick him up, and heard him say he had killed one of the Guffees, and would have killed the other if he had not been too quick for him.   Some one picked up Dixon's six-shooter pistol; it was cocked and one barrel had been discharged.   (This statement was also made by Tom Miskell, a witness for the State, who said that he picked up and uncocked the pistol, and handed it to Mr. Durham.)   John Guffee, while he was falling, cut at one of Dixon's arms with his knife.   (The State had proved that there was a fresh cut near Dixon's left elbow.)   Dixon, according to this witness, cocked his pistol at least three times while he and John Guffee had hold of each other, and one or more of the State's witnesses stated that the defendant cocked his gun two or three times during the same period.

W. Moody, for the defence, testified that the horse found by the sheriff behind the defendant's premises was saddled and hitched there without the consent or knowledge and in the absence of the defendant, and that he, though urged by his friends to leave, refused to do so.

W. Mullins, for the defence, testified that a very short time before the shooting he went to the house of the defendant, and finding him asleep, told Mrs. Guffee, his wife, that John Guffee had told witness to tell the defendant to come down town, — that Mike Dixon had a pistol cocked and drawn on him (John Guffee), and was about to kill him.   Mrs. Guffee

awoke the defendant and gave him the message, and he got up, put on his boots, got his gun, and went out of the yard-gate. Witness followed, and saw the defendant until he reached the scene of the conflict, and knew that John Guffee and the defendant did not meet. Nor was John Guffee at the house when the witness got there, nor while he stayed there.

Mrs. Guffee, the defendant's wife, testified that he came home about an hour before sunset on the day of the difficulty. Witness had requested him to come home early that evening, to go with her to a concert which was to be given in town that night. While witness was having some clothes prepared for him to wear, he pulled off his boots and laid down on the bed, where he soon fell asleep. William Mullins came in and told witness that John Guffee had sent for the defendant to come to the saloon, — that Mike Dixon had a pistol cocked on him (John Guffee), and was about to kill him. Witness awoke the defendant and told him about it, and he jumped up, put on his boots, got his gun, and ran down town towards his saloon. In a short time John Guffee came in, asked where the defendant was, and soon left. The defendant and Dixon were very warm friends. This witness fully corroborated the testimony of Moody with reference to the horse and the defendant's refusal to go off. She went with the defendant when he concealed himself in the cellar of the brewery to shield himself, as he said, from Dixon's friends, who he feared would kill him.

Mrs. Lizzie Guffee, the widow of John Guffee, testified to the same effect as the defendant's wife and Mullins in regard to the message brought by the latter from John Guffee, and its communication to the defendant, and the circumstances connected therewith. What had transpired between Dixon and John Guffee to cause the latter to send for the defendant does not appear more fully than was disclosed in the message communicated by Mullins, and in the altercation between the defendant and Dixon, already stated.

In the opinion of this court will be found so much of the charge to the jury as suffices to indicate the view of the case taken by the court below.

*S. W. T. Lanham* and *D. T. Bledsoe*, for the appellant.

*Thomas Ball*, Assistant Attorney-General, for the State.

CLARK, J.   In the determination of the novel and somewhat intricate questions involved in this case, as they arise upon the record, we are aided but little by the adjudged cases, or the writings of learned jurists who have made the department of criminal law their special study.   So far as we have been able to ascertain by an investigation necessarily hurried- and unsatisfactory, no case occupying the precise attitude of this has as yet come up for decision; and the general principles of criminal law, as found in the books, fail to supply us with rules for guidance, well-defined and established, and directly applicable to the issues arising upon the facts in proof.   In determining the law of the case, therefore, we must deduce our conclusions from the light of reason, unaided except it may be by certain established principles which may serve to fix the law of the case as applicable to certain portions of the transaction.

Upon the various issues legitimately arising from the evidence, it was competent for the jury to have found their verdict for murder in either degree, or for manslaughter, or justifiable homicide in self-defence ; and it was therefore incumbent upon the court to submit instructions applicable to either of these deductions, and embodying with substantial accuracy the peculiar principles of law which should govern them in determining intelligently the particular offence of which the defendant was actually guilty under the law and beyond a reasonable doubt.   Without attempting to set out with literal verbal accuracy these several issues, the law governing them may be briefly stated as follows : —

If the defendant and John Guffee, anterior to the original difficulty between John Guffee and the deceased, conspired together and agreed with each other to slay the deceased upon a favorable opportunity, and in pursuance of such common purpose and design, and after acts done indicating a preparation therefor and flight thereafter, John Guffee, by the procurement or consent of the defendant, brought on the original difficulty between himself and the deceased, for the purpose of affording a pretext for the one or the other to execute the common purpose, and by prearrangement the defendant came upon the scene, and, seizing upon the first favorable opportunity, executed his preconceived design and slew the deceased, then, if the jury believed this state of facts to exist beyond a reasonable doubt, their verdict was correct, and the defendant was properly convicted of murder in the first degree.   Or if, after the termination of the first difficulty between John Guffee and the deceased, the defendant, being informed thereof and in a state of mind sufficiently calm and self-possessed to consider of and contemplate the nature of the act about to be done, agreed with John Guffee to slay the deceased, or with mind sedate and deliberate formed the design to slay the deceased without any agreement with John Guffee, and in pursuance of such formed design and purpose proceeded to the scene of the difficulty, and upon a favorable opportunity carried his design and purpose into execution, in the absence of any fresh provocation upon the part of the deceased, then he was certainly guilty as found, if such facts existed beyond a reasonable doubt.   And further, if the defendant, with a sedate and deliberate mind, came upon the scene of the difficulty with the formed design to take the life of the deceased, which design and condition of the mind continued throughout the transaction, and for the purpose of affording a pretext for his wrongful and malicious action he encouraged by words or gestures the attack of the deceased upon his brother, or the attack upon the deceased by his brother, designing and intending to incite the deceased to

slay or seriously harm his brother or to attempt the so doing, and then to kill him in such attempt or actual perpetration, and he did so kill the deceased under the circumstances mentioned, then he would likewise be guilty of murder in the first degree as found by the jury.

Or if the difficulty was originally brought on by John Guffee with express malice, and the defendant, on being apprised of the pendency of the difficulty, went to the scene with no purpose or intention to stay its progress or to protect his brother from harm, and upon his arrival there, and after his brother came up and renewed the difficulty, he knowingly joined with him in its further progress, and aided him by acts, or encouraged him by words or gestures, to pursue the further prosecution of his unlawful purpose, and the deceased was slain in the progress of the difficulty, then the defendant would be equally culpable with his brother, had the latter lived, and should be punished for murder in the first degree. If, however, John Guffee was not actuated by express malice, but in a transport of passion, engendered from whatever cause, sought the difficulty with the deceased, and in its progress conceived the purpose to slay him, and the defendant, in a state of like passion at seeing his brother engaged, united with him in purpose and action, without attempting to stay the difficulty, but by word or action encouraged John in its prosecution, and the deceased was slain, then John, had he lived, would have been guilty of murder in the second degree, and the defendant is guilty of no higher offence.

But if it appeared satisfactorily in evidence that there was no preconceived purpose on the part of the defendant to take the life of the deceased, but that, when apprised of the threatened danger to his brother, he yielded to an impulse derived from nature and common to humanity, and rushed to the rescue of his brother, with no purpose or intention to join with him in any unlawful attack upon the deceased, but solely to prevent harm from befalling his brother, or to prevent the further progress of the difficulty

between his brother and the deceased, and his words and conduct at the scene of the difficulty were not intended or calculated to foment further strife, but were said and done with a view to discourage the continuance of the quarrel, and, without agency or participation on his part, the brother of the defendant renewed the difficulty with the deceased, which resulted in the death of his brother, and thereupon the defendant, in a spirit of revenge, conceived and executed immediately the purpose to kill the deceased, then, if the slaying of his brother was not an adequate cause to produce such passion, the defendant would not be guilty of murder in the first but in the second degree. Or if, after the defendant reached the scene of the difficulty, and after its renewal between the deceased and the defendant's brother, the defendant having no part or lot in the wrongful act or purpose of his brother, he conceived the purpose hypothetically or conditionally, and not absolutely, to kill or seriously injure the deceased in case the latter, in the progress of such difficulty, should kill or seriously injure his brother, and such conception did not spring from a sedate and deliberate mind, but was conceived when his mind was enraged or excited by the concomitant circumstances and surroundings, and was incapable of cool reflection, and there was not sufficient cooling-time between the conception and execution of such purpose, on the happening of the contemplated contingency, then the homicide would be murder in the second degree only, and not of a higher grade.

Addressing ourselves to a further inquiry as to the issues in the case, we are led naturally to consider the elements of manslaughter, and the principles governing that offence as applicable to the facts of this case. It is true our statute, in furnishing illustrations of causes deemed adequate in law to produce sudden passion sufficient to reduce a homicide to this grade, fails to prescribe that the slaying of one's brother in his immediate presence is an adequate cause. But it has been long since determined that the statutory

illustrations are not restrictive and exclusive, but are merely inserted as instances or examples by which those charged with the administration of the laws may be governed.   Certainly, to one at all familiar with the promptings of the human heart and the motives by which men are governed in their resentments and affections, it cannot be a matter of serious question that the death of a brother by the violence of another, in the immediate presence of one, is better calculated to produce, in a person of ordinary temper, a greater degree of anger, rage, or resentment, than any of the causes particularly designated in the statute, and that such an occurrence is amply sufficient to render the mind incapable of cool reflection.   Down deep in the human heart there is an abiding love for our kith and kin, which intensifies as we approach a common parentage.   A brother's virtues are magnified and his faults overlooked, and upon summons we fly to his relief without pausing to contemplate the consequences to ourselves, or taking much time to consider whether, in the particular instance, he is in the right or the wrong.   It suffices usually for us to know that he is in danger and needs our assistance, and we blindly follow that impulse born in us, and which impels us to rush to the rescue and save him from harm, and leaves us to contemplate our actions after the danger has passed and reason has resumed its sway.   This infirmity (or virtue) in human nature cannot be ignored in the practical administration of justice, and is well established in the law as pertaining to the relations even of master and servant, not to mention the other more important civil relations. Hor. & Thomp. on Self-Defence, 750, and authorities cited. Of course the principle cannot be taken into consideration, and can have no effect, when a brother, or parent, or master, etc., rushes to the aid of another engaged in the perpetration of an unlawful act, and knowingly joins in the execution of the original unlawful purpose ; for then he becomes a principal in law, and shares the culpability of the entire

transaction from its inception to its termination.    A master, maliciously intending to kill another, takes his servants with him, and engages his adversary on meeting him.    His servants, seeing their master engaged, rush to the 'rescue and kill his antagonist.    At common law this may be murder in the master, but only manslaughter in the servants. 1 Hawk. P. C., chap. 31, sect. 55.

The same principle applies to various other relations, including sometimes strangers (id., sect. 519); but, in law, hot blood is more naturally expected in a case of interference by a near relation or friend than in others more distantly removed.    Id., sect. 446.    If, therefore, the defendant in this case, not intending to unite with his brother in making an unlawful attack upon the deceased, and not knowing the unlawful purpose of his brother, but awaiting an anticipated necessity for his interference in order to protect his brother from serious bodily harm or death, threw up his gun and fired simultaneously with the discharge of the pistol by deceased at his brother, or, seeing the intention of the deceased to fire upon his brother and endeavoring to anticipate him, but failing, the deceased being too quick for him and discharging his pistol first, the defendant is not guilty of any higher grade of felonious homicide than manslaughter, notwithstanding the defendant's brother may have brought on the conflict with malicious intent.

Or if the defendant, with no purpose of injuring the deceased, but desiring and attempting to stop the progress of the difficulty between his brother and the deceased, and with no purpose or intention to aid his brother in an unlawful and violent attack upon the deceased, saw his brother shot down in his presence, and in a fit of sudden passion, engendered by this adequate cause, he voluntarily slew the deceased upon the instant, then he is guilty of manslaughter and should not be punished for any higher offence.

With reference to the remaining phase of the evidence, it may be said that in more than one view which may be taken

of it the defendant was not debarred of the right of self-defence, and was entitled to a distinct presentation of the principles of law applicable thereto. If, without participation upon his part with the actual difficulty between his brother and the deceased, the latter, immediately after firing upon his brother and giving him the mortal wound of which he died, cocked his pistol and presented it at the defendant, apparently intending to kill or seriously injure him, and from such action on the part of the deceased the defendant then and there had a reasonable expectation or fear of immediate death or serious bodily injury at the hands of the deceased, he had a right to act upon such appearances and slay the deceased; and a killing under such circumstances was justifiable. So also if the deceased, after firing the first shot at defendant's brother, immediately cocked his pistol and made other demonstrations indicating an apparent intention to again fire upon the brother, and the defendant honestly believed, without fault or negligence on his part, that the deceased was continuing his attack upon his brother, and, acting upon such belief, and with a purpose to prevent such further attack and to protect the life of his brother, he fired the shot which killed the deceased, he would be guilty of no higher offence than manslaughter.

Again: If, after the separation of John Guffee and the deceased, by the defendant and other parties in the drug-store, John Guffee abandoned all hostile purpose against the deceased, and dismissed from his mind all intention to renew the difficulty, and did no act or uttered no word from which the deceased could reasonably infer a further intention to prosecute the difficulty, and the deceased, without further provocation on John's part, drew his pistol, and by acts, words, or gestures reasonably indicated an immediate intention on his own part to attack John Guffee and to slay him or do him serious bodily injury, then John Guffee had a right, if he so believed and the danger was imminent, to defend himself in any capable and efficacious manner, to the

extent of seizing the person of the deceased and stabbing him, if in no other way such unlawful attack could be successfully avoided or thwarted; and if, at this juncture, and without previous coöperation on his part with the difficulty, the defendant, seeing the danger of his brother, fired the shot to protect his brother's life, and such action on his part reasonably appeared to be essential to the safety of his brother, then he would be alike justifiable, even though the shot came too late to save his brother.

It is believed the charge of the court failed to distinctly set forth the law applicable to the various phases of fact as indicated above, and in some particulars is not free from other objections in failing to state with accuracy the principles of law which should govern the jury in passing upon the issues actually submitted. In discussing the doctrine of self-defence and the right to interfere in behalf of a brother and for his protection, the court instructed the jury as follows : " But in such case it must appear that the party who thus acts acted on the defensive, or in the defence of his brother, and in such case it must further appear that neither the party killing nor his brother in whose behalf he acts was the aggressor, and provoked the difficulty with the apparent intention of taking advantage of any hostile movement of the other party. In such case the killing would be neither excusable nor justifiable. * * * When one person takes the life of another, in order to prevent the person killed from taking the life of such other person, such killing is neither excusable nor justifiable if it should appear that the person in whose behalf he interferes was in the wrong, and sought the difficulty with the apparent intention of bringing about a conflict that may result in death or serious bodily injury. When one person interferes in behalf of another, he becomes responsible for the acts of the person in whose behalf he interferes; and if the acts and circumstances would not justify the killing by the person in whose behalf he interferes, neither will the law justify him in taking life in behalf of such person."

The inherent vice of this extract from the charge of the court is, that it bound appellant to his brother with hooks of steel, and made him answerable for the acts of his brother, as well as for his own, without regard to the motive or intent, which may have been totally dissimilar in the breast of each. Throughout the transaction John Guffee may have been actuated by a malicious motive, a heart regardless of social duty and fatally bent upon mischief, while the intent of appellant may have been of a wholly different nature and character. Can it be said that in that event the same degree of culpability must attach to him as if his purpose had been the same as that of his brother? If so, one of the fundamental principles of criminal jurisprudence must be ignored and set at naught. If my brother seeks out his enemy upon the public highway with a view to slay him, and I, ignorant of his design as well as the cause of the difficulty and how it originated, but seeing him hotly engaged and the fortune of the fight turning against him, and realizing that he is in imminent danger of life or limb, rush to his rescue, and strike down his antagonist in order to save his life, must I, under such circumstances, be adjudged guilty of murder with express malice, merely because my brother would be so adjudged in case he had inflicted the mortal blow? If the law is so written in the books, we have failed to discover it. Nature has written her own law differently in the hearts of men.

Of course, if one joins with another in the execution of an unlawful purpose, knowing that purpose, he is equally accountable for the result, no matter at what stage of the transaction his conjunction occurs, and no matter how near and dear the natural relation between them. But, as in all other instances, there must be a unison of purpose and intent to accomplish the original undertaking, and all others naturally incident thereto or within the scope and purview thereof, before an equal culpability attaches. Many familiar illustrations of this principle are furnished in the books, to some of which we refer without elaboration. 2 Archb. Cr.

Pr. & Pl. (16th ed.) 250, 251; 1 Russ. on Cr. 590 *et seq.;* *Rex* v. *Hawkins,* 3 Car. & P. 392; *Regina* v. *Caton,* 12 Cox's C. C. 624.

Russell, in discussing this principle, says: "From this it follows *à fortiori,* that if a man-servant, or friend, or even a stranger, coming suddenly, and seeing him fighting with another man, side with him and kill the other man, or seeing his sword broken, send him another, wherewith he kills the other man, such servant, friend, or stranger will be only guilty of manslaughter. 1 Hawk. P. C., chap. 31, sect. 56; 1 East's P. C. 290, chap. 5, sect. 58. But this proposes that the person interfering does not know that the fighting is upon malice; for though if A. and B. fight upon malice, and C., the friend or servant of A., not being acquainted therewith, come in and take part against B., and kill him, this (though murder in A.) is only manslaughter in C., yet it would be otherwise if C. had known that the fighting was upon malice, for then it would be murder in both." 1 Russ. on Cr. 590.

Thus we see that the governing principle in this, as in all crime, is the intent with which the act is done. Not the intent with which the party aided brought on the difficulty, or prosecuted it after its inception, but the intent with which the party acted who is on trial, and who came to the aid of the other; and by that intent must his guilt be estimated and his punishment be meted out, if his act be found culpable. According to his own act and intent does the law measure him, and hold him guilty of murder, or of manslaughter, or entirely justifiable, as the facts may warrant; and the intent of the party aided is immaterial, until the knowledge, or means of knowledge, of the defendant, and his purpose and intent in participating in the affray, are ascertained.

This error permeates the entire charge of the court relating to self-defence, and is carried into the application of the law to the particular case to such an extent as neces-

sarily to have impressed itself upon the minds of the jury
and caused them to give it undue weight and consideration
in their deliberations; and under its direction it was hardly
possible for the jury to have found for a less grade than
murder in the first degree.

In the progress of the charge, the jury were further
instructed as follows: "You have seen from paragraph
7 of this charge that to take human life is always un-
lawful unless the same occurs under circumstances which
excuse or justify the killing; and when an unlawful killing
is clearly shown to have been done, it is for the defendant
to show facts which mitigate or reduce the offence below
murder.    When this is not done, the law implies or
imputes malice to such unlawful killing." In the case of
*Harris* v. *The State*, decided at the present term, this court
had occasion to examine with some care the doctrine of
implied malice, and sustained an instruction which told the
jury, substantially, that when an unlawful killing is proved,
and there are no circumstances in evidence which tend to
show express malice or which tend to mitigate, excuse, or
justify the act, then the law implied malice, and the offence
was murder in the second degree. But the instruction
above quoted varies essentially from the principle recog-
nized in that case, and is clearly erroneous in so far as it shifts
the burden upon a defendant to establish mitigating facts
and circumstances. It is never incumbent upon a defend-
ant on trial in a criminal prosecution to show any facts in
mitigation, unless such mitigation fails to appear in the
evidence against him, and the facts established by the State
show beyond a reasonable doubt a *primâ facie* case of
guilt.    *Leonard* v. *The State*, 7 Texas Ct. App. 417.    And
the charge of the court practically instructs the jury that
they cannot consider any mitigating facts and circumstances
unless they appear in the defendant's evidence; for it tells
them that "it is for the defendant to show facts which miti-
gate," etc., and "when this is not done"—that is, the

defendant has not shown it — the law implies the malice. The general current of modern authorities condemn the principle as unsound and erroneous. *Hall* v. *The State*, Galveston Term, 1875 ; *Perry* v. *The State*, 44 Texas, 473 ; *Brown* v. *The State*, 4 Texas Ct. App. 275 ; *Ake* v. *The State*, 6 Texas Ct. App. 418 ; *The State* v. *Swayze*, 30 La. An. 1325 ; *Maher* v. *The People*, 10 Mich. 212 ; *The People* v. *Moody*, 45 Cal. 289 ; *The State* v. *Porter*, 34 Iowa, 131.

The other errors assigned are not tenable, and need ˙no discussion. Because the charge of the court failed to set forth distinctly the law applicable to the case, the judgment is reversed and the cause remanded.

*Reversed and remanded.*