# Pearce *v.* The State.

## *Murder.*

(Decided April 4, 1912. 58 South. 996.)

1. *Conspirarcy; Nature and Elements.*—Where two or more persons either by pre-arrangement, or upon an emergency, enter upon a common purpose having in contemplation the commission of a crime, each is a conspirator, and if the purpose is carried out, each is guilty of the offense committed, whether he did any overt act or not.

2. *Same; To Commit Crime; Accountability.*—The criminal accountability of a conspirator extends not only to the purpose in which he is engaged, but to the proximate and natural consequence of such purpose.

3. *Same; Community of Purpose; Evidence.*—The community of purpose, or conspiracy between conspirators need not be proven by positive testimony, but its existence and extent are to be determined by the jury from the evidence and conduct of the parties.

4. *Homicide; Justifiable; Defense of Another.*—Where a son in the necessary defense of his father kills another, his right to justify on the grounds of self defense must have the same foundation as

[Pearce v. The State.]

the act of the father would have had if he had committed homicide; and the father. as well as the son must be in a position to invoke the doctrine of self defense.

5. *Same; Degree.*—Where one provokes a difficulty, and is afterwards forced by the unanticipated deadly assault of another person to take such person's life to protect his own, he is not, as a matter of law, necessarily guilty of murder in one of its degrees, but may be guilty of manslaughter in the first degree.

6. *Same; Jury Question.*—It is for the jury to determine under the law and the facts the degree of homicide of which a defendant is guilty, and to fix the punishment therefor.

7. *Same; Evidence; Lawfulness of Act.*—Where the State claimed that the defendant had entered into a conspiracy with others to remove an obstruction placed in a road by the deceased, and to take the life of any person who might oppose them in doing so, if necessary, a writ enjoining the obstruction of the road by deceased and showing an endorsement of service upon the day before the difficulty, was admissible as tending to show that defendant had a right to travel the road and remove the obstruction, and also as tending to show that defendant had the right to presume that deceased would not be present and molest him while traveling the road.

8. *Same; Evidence; Presence of Accused.*—Where the State attempted to show that the defendant had conspired with others to forcibly remove an obstruction in the road, and if necessary to take the life of any person, who might oppose them, and did show that the defendant was present at the time of the homicide armed with a shot gun and that his younger brother was also present armed with a gun, evidence that the defendant was not over seventeen years old and was under the control of his father, and had been instructed by his father to go and help remove the obstruction, and that afterwards he might go hunting was admissible as tending to explain defendant's presence there armed with a shot gun.

9. *Appeal and Error; Harmless Error; Evidence.*—The erroneous exclusion of record evidence was not rendered harmless by the fact that defendant was able to get the evidence before the jury by the statement of a witness whose testimony was disputed, since the jury might not have believed the witness.

10. *Trial; Province of Court and Jury; Weight and Credibility of Evidence.*—The weight to be given the evidence, the inferences to be drawn where it is susceptible of more than one rational conclusion, and the credibility of the witness are for the jury alone.

APPEAL from Anniston City Court.

Heard before Hon. A. H. ALSTON.

Cross Pearce was convicted of murder in the second degree, and he appeals. Reversed and remanded.

TATE & WALKER, and KNOX, ACKER, DIXON & STERNE, for appellant. Counsel discuss the testimony introduced and excluded to which objection was interposed,

but cite no authority in support of most of their contentions. They insist that the court erred in excluding the testimony of the nature and character of the road as shedding light on the right of the defendants and other persons to travel the road where the difficulty took place.—*Rosser v. Bunn,* 66 Ala. 89; *Trump v. McDonald,* 120 Ala. 204. Any evidence upon a question of conspiracy is improperly admitted until sufficient proof has been offered to make out a prima facie case of conspiracy.—*McAnally v. The State,* 74 Ala. 16; *Phoenix I. Co. v. Moog,* 78 Ala. 284; *Johnson's case,* 87 Ala. 43; 8 Cyc. 680; 6 A. & E. Env. of Law, 868. The court erred in excluding the injunction papers.—*Carden v. The State,* 84 Ala. 418; *Marler v. The State,* 67 Ala. 55; *Childs v. The State,* 55 Ala. 25. Acts and declarations of a co-conspirator made after the accomplishment of the conspiracy are not admissible.—*Phoenix I. Co. v. Moog, supra; Logan v. U. S.,* 144 U. S. 63; *Brown v. U. S.,* 150 U. S. 93. The court erred in its oral charge as to inference of malice from the use of the shotgun.—*Hornsby v. The State,* 94 Ala. 66. Charges 2, 12, 20, 21, 26, 27, 28, 29, 30, 31, 32, 33, 36, 38 and 53 should have been given.—*Karr v. The State,* 106 Ala. 1; *Whatley v. The State,* 91 Ala. 108; *Gibson v. The State,* 91 Ala. 64. Charges 4, 34 and 44 should have been given.—*DeArman v. The State,* 71 Ala. 351; *Story v. The State,* 71 Ala. 330. Charles 23, 24 and 25 should have been given.— Authorities supra and *Bones v. The State,* 117 Ala. 138. Charges 39 and 40 should have been given.—*Martin v. The State,* 119 Ala. 1; *Stoneking v. The State,* 118 Ala. 68; *Compton v. The State,* 110 Ala. 24. Charge 54 should have been given.—*DeArman v. The State, supra.*

R. C. BRICKELL, Attorney General, and W. L. MARTIN, Assistant Attorney General, for the State. Anderson and Murphy qualified as experts and the court prop-

[Pearce v. The State.]

erly admitted their evidence.—*Rash v. The State*, 61 Ala. 89; *Golson v. The State*, 124 Ala. 8; *Clemons v. The State*, 167 Ala. 30. The fact that the boy drove the wagon on that occasion had a tendency to show conspiracy and concerted action.—*Bonner v. The State*, 107 Ala. 97; *Ex parte Bonner*, 100 Ala. 114. Counsel discuss other assignments of error relative to evidence, but without further citation of authority. Charge 2 was properly refused.—*Gibson v. State*, 91 Ala. 64; *Karr v. The State*, 106 Ala. 1; 89 N. C. 481; 50 Mo. 40; 86 Ky. 440; *Bostick v. The State*, 94 Ala. 45. Charge 7 was properly refused.—*Prater v. The State*, 107 Ala. 26. Charge 18 was properly refused.—*Miller v. The State*, 107 Ala. 40. Counsel discuss other charges refused, but without further citation of authority.

DE GRAFFENRIED, J.—1. In the case of *Tanner v. State*, 92 Ala. 1, 9 South. 613, the Supreme Court, through Stone, C. J., uses the following language: "When two or more enter upon a common enterprise or adventure, whether by prearrangement or entered into on the emergency, and that enterprise contemplates the commission of a criminal offense, then each is a conspirator, and, if the purpose is carried out, each is guilty of the offense committed, whether he did any overt act or not. This rests on the principle that one who is present, encouraging, aiding, abetting, or assisting, or who is ready to aid, abet, or assist the active perpetrator in the commission of the offense, is a guilty participant, and in the eye of the law is equally guilty with the one who does the act. And this criminal accountability extends, not alone to the enterprise, adventure, or encounter in which the conspirators are engaged, but it takes in the proximate, natural, and logical consequences of such adventure. This, because all men are presumed to intend the proximate, natural, and logical consequences

of acts intentionally done; and one who is present, encouraging or ready to aid another in such conditions, must be presumed to be cognizant of that other's intention, to the extent above expressed. If such conspiracy, or community of purpose, embrace the contingency that a deadly encounter may ensue, with the common intention, express or implied, to encourage, aid or assist, even to the taking of life, should the exigencies of the encounter lead up to that result, then, as a general rule, the act of one becomes the act of all, and the one who encourages, or stands ready to assist, is alike guilty with the one who perpetrates the violence. And such community of purpose or conspiracy need not be proved by positive testimony. It rarely is so proved. The jury are to determine whether it exists, and the extent of it, from the conduct of the parties, and all the testimony in the cause." We have quoted the above because it concisely states the law as applied to the tendencies of the evidence which was introduced in this case on behalf of the state, and we regard the quotation as an apt, concise, and correct statement of the law as applied to the doctrine of conspiracy.

The facts in the present case are as follows: The grand jury of Calhoun county, at the February term, 1911, of the city court of Anniston, jointly indicted John Pearce, Cross Pearce, William Kennedy, Ada Kennedy, John Fowler, and John Eaton, alias John Eden, for murder in the first degree. There was, by each of the defendants, a demand for a severance, and the severance prayed for was granted by the court. The defendant, Cross Pearce, was tried by a jury, was convicted of murder in the second degree, was sentenced to the penitentiary for a period of 20 years, and appeals.

The defendant was charged with the murder of Sarge Kennedy, the son of Shelton Kennedy, who was also

killed in the difficulty which culminated in the hom-
icide now under consideration. William Kennedy, one
of the defendants named in the above indictment, was
the father of said Shelton Kennedy, and the grandfather
of said Sarge Kennedy. Ada Kennedy, one of the other
defendants named in the above indictment, was a sister
of said Shelton Kennedy and an aunt of the said Sarge
Kennedy. John Pearce, named as one of the defend-
ants in said indictment, is the father of the defendant
Cross Pearce, and the defendant Cross Pearce claims
that he should not have been convicted of the offense
with which he was charged, because, he claims, all that
he did in the difficulty in which Shelton Kennedy and
Sarge Kennedy were killed was done to protect his
father, John Pearce, from death or great bodily harm
at the hands of said Sarge Kennedy.

The general rules governing the subject of self-defense
in cases of homicide are well known, and need not be
repeated here. As the defendant, when he shot Sarge
Kennedy, shot, not in defense of himself, but in the
alleged defense of his father, he thereby assumed, under
the law, the same attitude, so far as his right to invoke
the doctrine of self-defense is concerned, which his
father occupied with reference to the difficulty. Assum-
ing, for the present, that all the testimony in the case
tends to show that the defendant was present, aiding,
abetting, or encouraging the father, the defendant, so
far as his right of self-defense, under the law, is con-
cerned, simply stepped into his father's shoes when he
took part in the difficulty. A son may do, in the neces-
sary defense of his father, that which he may lawfully
do under the same circumstances for himself, but not
more. Though a son may kill another in the necessary
defense of his father, yet in such a case, on the question
of justifiable self-defense, the act of the son must have

the same construction as the act of the father would have had if the homicide had been committed by himself. "If the defense be that the blow was struck to prevent the homicide of another, then that other, as well as the actor, must be in a condition to invoke the doctrine of justifiable self-defense."—*Bostic v. State,* 94 Ala. 45, 10 South. 602; *Stanley v. Commonwealth,* 86 Ky. 440, 6 S. W. 155, 9 Am. St. Rep. 305; *Karr v. State,* 106 Ala. 1, 17 South. 328; *Jordan v. State,* 82 Ala. 1, 2 South. 460.

The evidence in this case shows that Dr. John Pearce, one of the defendants, is a sawmill man who lives in Calhoun county several miles from Gadsden, which is in Etowah county. He was accustomed to haul the products of his mill by means of wagons from the mill to Gadsden. There was a road which some of the evidence tends to show had been used by the public for many years, probably more than 20 years, and the public, by reason of such user, may have acquired the right to use and travel the said road. This road was about two miles long, and a part of it went through lands which belonged to Shelton Kennedy. It is inferable from the evidence that Dr. Pearce had been accustomed to use this road in hauling his lumber to Gadsden, but about 30 or 40 days before the homicide someone cut trees into the road and placed a wire fence across it at the point where the road crossed the lands of Shelton Kennedy. There is no positive evidence that Shelton Kennedy caused these obstructions, but presumptively he did so. After the obstructions were placed upon the road, Dr. Pearce does not seem to have attempted to use it or to have attempted to remove the obstructions until the morning of the difficulty. On the morning of the difficulty, Dr. Pearce, in company with the parties named as defendants in the above indictment, and with

two or three children, left his mill with his wagons.
Dr. Pearce at the time he left the mill went armed with
a Winchester rifle and a pistol. His son, Cross Pearce,
also accompanied the party, and was armed with a shot-
gun. Another of the defendants appears to have been
armed with a small shotgun, which some of the evidence
tends to show belong to a young son of Dr. Pearce, and
still another one of the defendants was armed with what
the witnesses termed an army rifle. There were several
wagons, and some of the parties who were accustomed
to drive the wagons did not drive them that morning;
the wagons being driven by small boys, and the defend-
ants accompanying them as above stated. It appears
from the evidence that William Kennedy, who was the
father of Shelton Kennedy, preceded the other defend-
ants, and was at the scene of the homicide when they
reached there. It further appears from the evidence
that Dr. Pearce lived in the same house with William
Kennedy and Ada Kennedy, and that, on the morning
of the homicide, Ada Kennedy drove over to the mill,
having certainly one, and probably two, shotguns in the
buggy. The shotguns which she had, some of the testi-
mony tended to show, belonged to the defendant Cross
Pearce and a younger brother, 12 years of age, who
drove one of the wagons to the scene of the difficulty.
It further appears that an axe was carried along, to be
used in removing the obstructions from the road, and
that, when Dr. Pearce reached the scene of the homicide
with his wagons and teamsters, William Kennedy either
had gotten over the wire fence which had been placed
across the road or got over it shortly thereafter, and
was there in a colloquy with his son Shelton Kennedy,
and that Sarge Kennedy, a son of Shelton, was standing
near his father, and that both Shelton Kennedy and
Sarge Kennedy were armed. It further appears from

the evidence that, when Dr. Pearce reached the scene of the homicide, Shelton Kennedy told him that he did not propose to permit him to travel the road, and did not intend to allow him to remove the obstructions. Thereupon William Kennedy called for an axe, and Dr. Pearce threw the axe across the fence to him. William Kennedy then struck the fence with the axe for the purpose of cutting it down, and Shelton Kennedy then said that he would kill any man who undertook to remove the obstructions. There is some evidence in the record tending to show that at this point Dr. Pearce told Shelton Kennedy that the chancery court of Calhoun county had issued a writ of injunction, and that the writ had been served upon him, and that the writ enjoined him from further obstructing the road; that Shelton Kennedy replied that no writ of injunction had been served upon him, and further said, "Damn the injunction," and stated that he would kill any man who undertook to remove the obstruction. Thereupon, the evidence tends to show, William Kennedy raised the axe to strike the fence, and said, in substance, "Well, if you must kill some one, kill me," and that Shelton Kennedy replied, "No; there's the damned son of a bitch I want," and fired at Dr. Pearce. On this subject Dr. Pearce's testimony was as follows: "I told Shelton Kennedy he knew he had the injunction, and that it had been served, and about that time Mr. Kennedy raised the axe to strike the wire and he told him not to do that. He [Shelton Kennedy] shoved him [William Kennedy] with his hand the first time, and then punched him with his gun. It was a Winchester pump gun. His father told him to shoot him if that would settle it; that he had given him the land; that he had to have the road to get to his place, and to shoot him if it would settle it. Shelt said, 'No; there's the damned son of a bitch I want,' and

fired at me. I was right next to the log, to the left of the road going towards Gadsden, just a few feet from the wire fence. I'm not positive how far. I had walked out of the road a few steps. I had walked around to see around this obstruction better. Sarge was behind and a little to the left of his father from where I was standing. Both he and Shelt were in the road. At the time Shelt fired at me, I had my gun in my right hand, holding it by the barrel, and the stock resting on the log I had my foot on. When he fired in my direction, I commenced shooting as quick as I could at Shelt Kennedy with my Winchester. About the time Shelt fired, Sarge threw up his gun, and commenced shooting in my direction. Cross was in this road down towards the mill, behind me, to my right. He was in the road and I was out of it."

Some of the testimony on behalf of the defendant further tended to show that, when Dr. Pearce shot at Shelton Kennedy, Sarge Kennedy began shooting at Dr. Pearce, and that, when this occurred, Cross Pearce began shooting with a shotgun at Sarge Kennedy. There was evidence further tending to show that the shot from Cross Pearce's gun struck Sarge Kennedy in the back, but that Sarge Kennedy died of wounds which were inflicted by some person other than Cross Pearce, and that the wounds which were inflicted upon the person of Sarge Kennedy by Cross Pearce during the difficulty did not contribute to his death. .

One of the theories of the State was that all of the defendants named in the above indictment had entered into a conspiracy by force to remove the obstructions which had been placed in the road, and, if necessary, to take the life of any person who might oppose them in so doing. It appears from the evidence that Dr. Pearce and Shelton Kennedy were not on good terms, and there

was some evidence introduced on behalf of the defendant tending to show that Shelton Kennedy had on more than one occasion previous to the difficulty, threatened to take the life of Dr. Pearce, and that on the morning of the homicide Dr. Pearce was informed, while at his mill and before he left the mill with his wagons, that Shelton Kennedy had stated that morning to two young men that he did not intend to allow Dr. Pearce to travel said road. There was evidence, however, on the part of the defendant, tending to show that Dr. Pearce did not receive the notice, or that, if he did, he attributed it to a statement which had been made by Shelton Kennedy before the service of the writ of injunction upon him, which we will hereafter refer to.

For the purpose of explaining the reasons why he went up the road that morning with his wagons, prepared to remove the obstructions from the road, the defendant offered to prove that a short while before the homicide Dr. Pearce had filed a bill in the chancery court of Calhoun county to enjoin Shelton Kennedy from further obstructing the said road, and that on the day previous to the homicide the sheriff of the county had informed Dr. Pearce that the writ had been served. The defendant offered to introduce the writ, with the sheriff's endorsement showing the service, but the court refused to allow the writ to be introduced in evidence, and also refused to allow the defendant to show that on the day previous to the homicide Dr. Pearce had been informed by the sheriff that the writ had been served. The writ is in the record, and shows on its face that it had been served upon Shelton Kennedy by a deputy sheriff of Calhoun county. As the State undertook by its evidence to show that the defendants had entered into an unlawful conspiracy to do an act which they did not have a legal right to do, it seems to us that the above

writ was relevant. It had some tendency to show why Dr. Pearce went up the road that morning, and, it seems to us, tended to show whether at the time he went up the road he and those who accompanied him thought that they had a right to travel the road and to remove the obstructions. It also in our opinion had some tendency to show that the defendants had a right to presume that Shelton Kennedy would not be present and molest them in traveling the road.

For the purpose of explaining his presence there on the occasion named, the defendant, who, it appears, was not over 17 years of age, undertook to prove that he was instructed by his father on that morning to go to the point where the obstructions had been placed and aid in removing such obstructions, and that after that time he might go hunting. There was some evidence tending to show that the defendant's younger brother was also present at the time of the homicide and that his gun was there, and it seems to us that this evidence was also relevant as tending to explain why the defendant was present and why he had his shotgun with him on that occasion, and as also explaining the presence of the younger brother and the presence of the gun of the younger brother. It certainly had some tendency, if believed, to rebut the idea that the defendant had engaged in a conspiracy, and that he was there armed for the purpose of aiding and abetting the other defendants in carrying out a common design to violate the law. The defendant was a minor, and under his fathers dominion, subject to his lawful orders; and it seems to us that this testimony, which was offered by him, did not amount to a mere declaration in favor of interest, but to positive testimony tending to explain his presence at the time of the difficulty. Whenever a fact is relevant and competent, then, as a general rule, a trial court

should allow evidence to be given of the existence of such fact, and appellate courts will invariable reverse the judgment of a trial court when it refuses to admit relevant and competent. evidence, unless the entire record shows affirmatively that no injury was done to the party complaining by reason of such adverse ruling of the trial court.

In this case it may be. that Dr. Pearce provoked the difficulty. When he threw the axe to William Kennedy, for the purpose of enabling William Kennedy, against the protests of Shelton Kennedy, to cut the wire fence from the road, it may be that he did an act which necessarily tended to provoke the difficulty which ensued. Cross Pearce aided and abetted his father, according to his own testimony, in the homicide, and it may be that under the undisputed evidence in this case he cannot invoke the doctrine of self-defense.—*Jordan v. State,* 82 Ala. 1, 2 South. 460. If, however, there was no conspiracy, and if Cross Pearce was present at the time of the commission of the homicide for a lawful purpose and went there armed for a lawful purpose, and if Dr. Pearce went there armed for a lawful purpose (the testimony tends to show that his life had been threatened, and the jury might have inferred that he was armed because of that fact alone), even though Dr. Pearce provoked the difficulty, and even though he may, under all the evidence, be precluded from invoking the doctrine of self-defense, it was undoubtedly for the jury, under all the evidence in this case, if they discarded the theory that there was any conspiracy, to say whether Dr. Pearce was guilty of murder, and, if so, in what degree, or of manslaughter in the first degree, and also whether Cross Pearce was guilty of murder, and if so, in what degree, or only of manslaughter in the first degree.

It is not our understanding of the law that if a man provokes a difficulty, and then afterwards is forced, by an unanticipated deadly assault of his adversary, to take his adversary's life to protect his own, such a man is as matter of law necessarily guilty of murder in one of its degrees, and not of manslaughter in the first degree.

In addition to all this the law lodges in the jury trying a defendant for unlawful homicide the power to say what punishment shall be inflicted upon him, and we presume that jurors in fixing such punishment are governed by the facts and circumstances of each particular case as the evidence discloses the circumstances to be. In the present case, although Cross Pearce may have been legally guilty, under all the facts, of unlawful homicide (a question upon which it is not necessary for us to intimate an opinion), nevertheless the question of whether or not he was guilty of murder in one of its degrees or whether he was guilty of manslaughter in the first degree was a question for the jury. The jury convicted him of murder in the second degree, and fixed his punishment at 20 years. If the testimony to which w have above referred, which the court refused to allow to go before the jury, had been admitted, it may be that the jury would have convicted him of murder in the second degree, but the excluded evidence might have affected the jury on the question of punishment and they might have sentenced him to the penitentiary for a shorter period than 20 years, or, within their province, and within their province alone, they might have found the defendant guilty of manslaughter in the first degree and fixed his punishment at what, under all the circumstances, they thought his punishment should be.

For the above reasons, we are of the opinion that the trial court erred in refusing to admit the writ of injunction in evidence, and that it also erred in refusing to

allow the testimony which the defendant offered tending to show why Cross Pearce was present at the scene of the homicide and why he was armed on the occasion named.

2. The mere fact that the defendant was able to get before the jury the statement of Dr. Pearce that a writ of injunction had been issued does not render the refusal of the court to admit the writ of injunction in evidence error without injury. The jury may have disbelieved every word that Dr. Pearce said, and it appears that Shelton Kennedy denied that he had been served with the writ. The writ itself is conclusive evidence of its evistence, and shows that it had been served on Shelton Kennedy.

3. In all that we have above said we have discussed the questions presented from the viewpoint of the evidence most favorable to the defendant. It may be that every word in the testimony tending to authorize inferences favorable to the defendant is untrue. It may be that every word tending to establish such favorable inferences is true. That question we have no right to determine. We have not adverted to any of the salient features of the testimony tending to establish the defendant's guilt of murder in one of its degrees or of manslaughter in the first degree.

We have purposely refrained from any such discussion, because, as a general rule, the weight to be given testimony, the inferences to be drawn from it when it is susceptible to more than one rational conclusion, and the credibility of witnesses present questions for the jury and for the jury alone. We have simply undertaken to show that, as we understand this record, certain evidence which the defendant offered to introduce on his trial and which the court refused to allow him to intro-

duce was legally relevant, and that its exclusion from the jury by the court was reversible error.

4. There are numerous other questions presented to us by the record. One portion of the oral charge of the court to which exception was taken has certainly been condemned by the Supreme Court, and some of the written charges which the defendant requested the court to give to the jury and which the court refused to give, we think probably should have been given. The questions thus presented have in many cases been discussed by the Supreme Court, and we see no reason why we should again discuss them.—*Hornsby v. State,* 94 Ala. 66, 10 South. 522; *Hadley v. State,* 55 Ala. 37; *Mitchell v. State,* 60 Ala. 28; *Gibson v. State,* 89 Ala. 121, 8 South. 98, 18 Am. St. Rep. 96; 6 Mayfield's Dig. p. 106, § 8.

The judgment of the court below is reversed and the cause remanded.

— Reversed and remanded.