151 So. 614

### BINNS v. STATE.

I Div. 127.

Court of Appeals of Alabama.

Dec. 19, 1933.

Stevens, McCorvey, McLeod, Goode & Turner and Smith & Johnston, all of Mobile, for appellant.

Thos. E. Knight, Jr., Atty. Gen., for the State.

Brief did not reach the Reporter.

RICE, Judge.

Appellant was convicted of the offense of murder in the second degree, and his punishment fixed at imprisonment in the penitentiary for the term of twenty years.

It was shown without dispute that he shot (with a pistol) and killed one Berry Brewer.

The circumstances leading up to the killing were, in part, that Brewer was yardmaster of the Terminal Railway of the State Docks Commission, and, as such, had supervision over appellant who was a "switch foreman" working on the same job. It appears that the only way appellant could get work to do on the job was to be "called by Brewer"; the understood plan being, as we gather, that the various "switch crews," of which there were four, numbered in the order of their seniority, appellant belonging to the fourth, were to be "called" in rotation, that numbered 1 being called first, then that numbered 2, and so on, as the work required.

Bad feeling arose between Brewer and appellant, induced, appellant claimed—offering much strong testimony to support his claim —by his (appellant's) refusing to "split with Brewer" any pay he received for "working overtime" as the result of being called by Brewer; and by jealousy on the part of Brewer toward appellant caused by a report that appellant was being "considered" for Brewer's job.

At any rate, it seems clearly established that Brewer practiced discrimination toward appellant; switch crew No. 3 being allowed, under Brewer's directions, to "work around the clock," or make a double shift of sixteen hours, when, otherwise, it would have been necessary to "call out" crew No. 4, appellant's crew, and allow that crew to "have work," the "shift" being eight hours.

On the night before the morning of the killing appellant observed that crew No. 3 was at work, said crew having begun its shift at 2:00 p. m., and he likewise observed that, in all probability, said crew could not complete the · work in hand—unloading a large boat, or loading it, etc.—by 10:00 p. m., the expiration of the shift. So he repaired to his home, went to bed, and instructed his wife to "listen for the telephone," stating that he was sure to be called this night. But, awaking about 9:30 p. m., he inquired of his wife about a phone call, and was told that none had been received. He arose, called up himself to know if he had been wanted; but was told he had not been.

The next morning, the day of the killing, he arose very early, went away without his breakfast, there being practically no food in his house, and called upon a friend who was one of the men employed as a member of "switch crew No. 3," hereinabove referred to. Finding said friend dressed in his "working clothes," upon inquiry he was informed by said friend that "crew No. 3" had "worked around the clock," or put in a double shift of sixteen hours the night before.

Appellant was much upset; cried; and informed the said friend that there was no food at his home for his family, etc. He asked the friend for a loan, and received 50 cents. But the friend, referred to in the evidence as "Red" Paige, told appellant to go back to his own home, prepare a list of needed groceries, and come back at 12:00 o'clock, when "Red" said he would go with him to a grocery store and get the articles on his ("Red's") credit.

Appellant returned to his home, informed and instructed his wife about the "list of groceries," but went, with his pistol in his pocket, to the docks (his working place, when he worked) and sought out Brewer, the deceased. In the altercation which ensued immediately upon his finding Brewer, he shot and killed Brewer as before mentioned.

Appellant pleaded not guilty, and not guilty by reason of insanity.

In support of his plea of not guilty he introduced testimony tending to support his

contention that he sought out and, approached Brewer solely for the purpose of seeing if he could "get work" that day or night, this being the usual method of finding out about when work might be had, etc. And that Brewer immediately, and without provocation, etc., made a hostile demonstration as if to shoot, etc., appellant—in such sort that, if appellant's testimony were true, he would have been justified in shooting, etc., Brewer, in order to save his own life.

In support of his plea of not guilty by reason of insanity, appellant offered much testimony to the effect that Brewer had stated, in substance, that while he could. not fire (discharge) appellant, he would "starve the s——— of a b——— to death"; that he (Brewer) had on numerous occasions, and rather consistently, proceeded to "make good his threat," by depriving appellant of the work he would have received under an impartial yardmaster, etc.; that Brewer had made such headway in his announced effort that appellant's house rent was "far behind," his credit, formerly good, exhausted at all the grocery stores, and the food supply on hand in his home down to "one egg, a little coffee, and a few slices of bread," which, when he left home on the day of the killing, he refused, on his wife's offer to "prepare his breakfast," to eat, stating to his wife that she, and the other member of his family, might have that. And that these various things had preyed on his mind to the extent that his reason was dethroned, etc.

All the issues raised in the case were, we think, properly submitted to the jury.

The tendencies and implications of the state's testimony were to the effect that the appellant deliberately armed himself with a pistol and. went to the State Docks (herein sometimes referred to simply as the "docks") to kill Brewer.

▮ Appellant had the right to explain any incriminating facts or inferences which might arise from the evidence; and, therefore, the testimony which he offered tending to show that "he customarily carried a pistol"; that there were a number of "holdups" about the State Docks about this time; that "tramps" were often known to pass through or loiter there; and that special policemen had been designated by the city (of Mobile) for duty in this area; or, in short, that there was other sufficient reason for his having his pistol at the time of the encounter with Brewer than the one ascribed to him by the state's testimony—a premeditated purpose to kill Brewer—should have been received. Its exclusion by the court constituted prejudicial error.

As said by Mr. Wigmore: "According to the logical principle of Explanation, it is always open to the person against whom such conduct is offered to explain away its force by showing some other hypothesis to be equally or more natural, as the reason for the conduct, than the design which it is claimed to evidence. Any explanation which is at all plausible should be received." Wigmore on Evidence, Volume 1 (2d Ed.) § 239, page 497.

If, indeed, there were "holdups"—by which we understand robberies—prevalent at the time in question at the place involved; if "tramps" were numerous (and by "tramps" we believe unattached transients, portending danger to those encountering them, is understood); if these conditions had been thought of sufficient danger to cause the city having jurisdiction of the premises to take extra precautions—it may well have been that the jury might have concluded that appellant "had good reason to apprehend an attack" (Code 1923, § 3485) in such sort that he was thoroughly justified in having his pistol at the time, etc., and that these considerations might be the reason for his having the same, rather than any purpose to do harm to Brewer, the deceased. The whole circumstances should have been allowed to go to the jury. See Pearce v. State, 4 Ala. App. 32, 58 So. 996.

▮▮ There was evidence of threats made by Brewer against appellant; and that these threats had been communicated to appellant. Of course appellant had the right to, and doubtless did, interpret any action, etc., of Brewer upon the occasion of the fatal rencounter in the light of these threats—some of which were against his "job," and some of which were against his life.

Appellant could not rightfully be deprived of whatever favorable attitude the jury might assume toward his actions, testimony, etc., in the light of the testimony that he knew of these threats, etc., by allowing, as was done, a witness to testify that, on the morning of the killing, and before same occurred, Brewer, out of the hearing and presence of appellant, had stated to the witness, in effect, that, if he had known the other crew (crew No. 3) would not have finished the work, etc. (unloading, or loading, the boat, hereinabove referred to) by 10:00 p. m., the regular expiration of their "shift," "he would have called the other crew" (meaning crew No. 4, to which appellant belonged). This was but a sort of "apology" by Brewer for having failed to "call appellant"; was no part of the res gestæ; was hearsay; and strictly inadmissible. It was calculated to, and doubtless did, have an effect on the jury very prejudicial to appellant. See Spicer v. State, 188 Ala. 9, 30, 65 So. 972; Domingus v. State, 94 Ala. 9, 12, 11 So. 190, and other authorities that might be cited.

The case was, in the main, well and ably tried. We see no necessity for discussing the other questions raised. Upon another trial they will perhaps not again occur.

But for the errors pointed out the judgment is reversed, and the cause remanded.

Reversed and remanded.