[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 645 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 646 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 647 
Leon Devon Rogers was convicted of two counts of murder and one count of attempted murder. See §§ 13A-6-2 and 13A-4-2, Ala. Code 1975. He was sentenced to life imprisonment for each conviction; the sentences were to run concurrently.
The evidence adduced at trial indicated the following. On February 4, 1999, Rogers and his brother, Rudolph Rogers (hereinafter "Rudolph"), attended a Mardi Gras parade in downtown Mobile. As the parade drew to a close, Rudolph got into a fight with Angelo Gordon. Michael Davis, Carlos Taylor, and several other people joined in the fight. During the fight, Rogers shot and killed Gordon and Davis, and he shot and injured Taylor. The testimony was conflicting as to who started the fight. Taylor testified that Rudolph started the fight when he and three other men attacked Gordon. Gabrielle White, a witness to the incident, also testified that Rudolph started the fight. However, Tameka Brooks, another witness, testified that Rudolph and Gordon just "walked into each other . . . and started fighting." (R. 155.) Taylor testified that during the fight he ended up entangled with Rudolph and that while he was trying to disengage himself from Rudolph, Rogers approached, pointed a pistol at him, said "Nigger, get off my brother," and fired. (R. 117.) Taylor was shot in the arm. White testified that just before Rogers fired, she heard him tell Rudolph to move out of the way.
Two shell casings and one bullet were recovered at the scene; both were from a *Page 648 
.40-caliber pistol. The State presented evidence that Rogers had purchased a .40-caliber pistol on August 27, 1998. The State also presented evidence that in January 1998, approximately 13 months before the incident out of which the charges at issue here arose, Gordon had shot and seriously wounded Rudolph. At the time of the Mardi Gras incident, Gordon was awaiting trial on a charge of assault in the first degree, relating to his shooting of Rudolph.
 I.
Rogers contends that the trial court erred in denying his Batson v.Kentucky, 476 U.S. 79 (1986), motion. (Issue II in Rogers's brief.)
The record reflects that the prosecutor used four of her eight peremptory strikes to remove four of five black veniremembers. After Rogers's trial counsel entered a Batson objection alleging that the prosecutor's strikes were racially motivated, the trial court, without making a specific finding that Rogers had established a prima facie case of discrimination, requested that the prosecutor give her reasons for the strikes. Without objecting, the prosecutor offered explanations for the challenged strikes. In a Batson context, it is well settled that where, as in the present case, the trial court does not make an express finding that a prima facie case of discrimination has been established but nonetheless requires the challenged party to explain its peremptory strikes, the appellate court will presume that the trial court found a prima facie case and will evaluate the explanations offered by the challenged party. See, e.g., Huntley v. State, 627 So.2d 1013, 1016
(Ala. 1992); and Williams v. State, 548 So.2d 501, 504 (Ala.Crim.App. 1988), cert. denied, 489 U.S. 1028 (1989).
The prosecutor gave the following reasons for her strikes against black veniremembers:
Juror nos. 16 and 18: "[B]ecause they were teachers."
 Juror no. 23: "I struck her for two reasons. One, she said that her brother had been murdered at a McDonald's [fast-food restaurant], and then she said that she could be fair and impartial in this case, and I have some reservations about that, as to whether or not she can truly be fair and impartial in this case based on her past.
 "I also have some reservation about her. While Mr. Armstrong [Rogers's counsel] was asking questions, a detective informed me that she was looking and laughing over at the defendant at a time when it would not have been appropriate to be, you know, laughing at him or looking over there at him and making faces."
 Juror no. 29: "We struck 29 because when I asked whether anybody, with the exception of a traffic offense, had ever been charged, arrested or convicted of an offense — he does have a prior criminal history. He also has an earring in his ear that I saw and I did not like, and that is why I struck him, because he did not answer me truthfully about that particular question."
(R. 56-57.)
On appeal, Rogers does not challenge the prosecutor's strikes against jurors no. 16, 18, or 29. However, Rogers contends that the prosecutor improperly struck juror no. 23 and that the prosecutor's stated reasons for doing so were pretextual.
 "The party alleging racially discriminatory use of peremptory challenges *Page 649 
 bears the burden of establishing a prima facie case of discrimination. Ex parte Branch, 526 So.2d 609, 622
(Ala. 1987). Once a prima facie case has been established, a presumption is created that the peremptory challenges were used to discriminate against black jurors. Id. at 623. Where the prosecutor is required to explain his peremptory strikes, he or she must offer `"a clear, specific, and legitimate reason for the challenge which relates to the particular case to be tried, and which is nondiscriminatory. However, this showing need not rise to the level of a challenge for cause."' McLeod v. State, 581 So.2d 1144, 1155 (Ala.Crim.App. 1990), quoting Ex parte Branch, 526 So.2d at 623. (Emphasis in Branch; citation omitted.) Once the responding party has articulated a race-neutral reason or explanation for eliminating the challenged jurors, the moving party can offer evidence showing that the reason or explanation is merely a sham or pretext. Ex parte Branch, 526 So.2d at 624. When the trial court has followed this procedure, its determination will be overturned only if that determination is `clearly erroneous.' Id. at 625."
Burgess v. State, 811 So.2d 557, 572-573 (Ala.Cr.App. 1998), aff'd in pertinent part, rev'd on other grounds, 811 So.2d 617 (Ala. 2000).
 "Within the context of Batson, a `race-neutral' explanation `means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral. . . . In evaluating the race-neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law. . . . [E]valuation of the prosecutor's state of mind based on demeanor and credibility lies `peculiarly within the trial judges's province.'"
Allen v. State, 659 So.2d 135, 147 (Ala.Crim.App. 1994) (emphasis added; citations omitted).
We find that the prosecutor's reasons for striking juror no. 23 were facially race-neutral. Although striking a veniremember based on his or her demeanor or body language in general is disfavored, more specific concerns regarding a veniremember's demeanor may be sufficient. Id.
 "Demeanor, the way in which a person behaves or conducts himself, can include a number of characteristics, such as the desire not to serve as a juror, disinterest in the proceedings as a whole, inattentiveness exhibited by talking with others during voir dire, perceived hostility in answering prosecution questions, perceived favoritism toward the accused, or simply a general lack of respect for the proceedings which could be exhibited by such behavior as chewing gum, wearing sunglasses, hats, excessive jewelry, or inappropriate clothing while inside the courtroom."
Stephens v. State, 580 So.2d 11, 19 (Ala.Crim.App. 1990), aff'd,580 So.2d 26 (Ala.), cert. denied, 502 U.S. 859 (1991). The prosecutor stated that juror no. 23 was "looking and laughing" at the defendant during defense counsel's questioning of the venire. This type of behavior suggests a disinterest in the proceedings and/or a lack of respect for the process. See, e.g., Hart v. State, 612 So.2d 520 (Ala.Crim.App. 1992), aff'd, 612 So.2d 536 (Ala.), cert. denied, 508 U.S. 953 (1993) *Page 650 
(explanation that veniremember was inattentive and hostile deemed to be race neutral); Mathews v. State, 534 So.2d 1129, 1130 (Ala.Crim.App. 1988) (explanation that juror "didn't seem very attentive" upheld against a Batson challenge); Nesbitt v. State, 531 So.2d 37 (Ala.Crim.App. 1987) (explanation that juror "appeared to be inattentive" held to be a neutral reason); and Smith v. State, 531 So.2d 1245, 1248 (Ala.Crim.App. 1987) (explanation that juror "appeared to be asleep or inattentive" held to be a neutral reason). Likewise, the prosecutor's reservations about the ability of juror no. 23 to be fair and impartial given the fact that her brother had been murdered a few years earlier was also a facially valid race-neutral reason for striking her. See, e.g., Demunn v. State,627 So.2d 1005 (Ala.Crim.App. 1991), aff'd, 627 So.2d 1010 (Ala. 1992) ("The striking of venirepersons on the basis of bias is race-neutral.").
Because the prosecutor's proffered reasons for striking juror no. 23 were facially race-neutral, the burden then shifted to Rogers to show that the reasons were shams or pretextual. Rogers argues that the prosecutor's reasons were pretextual because, he says, neither reason is supported by the record. Although we agree that the demeanor of juror no. 23 is not reflected in the record, when the prosecutor stated that juror no. 23 was looking and laughing at Rogers during voir dire, Rogers did not object or disagree that juror no. 23 was, in fact, being inattentive. In addition, although juror no. 23 stated during voir dire that she could be fair and impartial despite her brother's murder and, as Rogers correctly points out, juror no. 23 was not questioned further on this issue, only two prospective jurors had relatives and/or friends who had been murdered. One of those jurors, whose husband had been murdered almost 20 years before the trial in this case, stated that she could not, given her husband's murder, be fair and impartial, and the prosecutor struck this juror for cause. Juror no. 23, on the other hand, whose brother had been murdered only six years earlier, stated that she could be fair and impartial. We agree with the State's argument in its brief to this Court that the fact that the prosecutor removed the only two jurors who had relatives who had been murdered indicates that the prosecutor's expressed reservations about the ability of juror no. 23 to be fair and impartial during a murder trial were not pretextual.
Because the prosecutor's proffered reasons for striking juror no. 23 were facially race-neutral and because Rogers failed to show that those reasons were merely pretextual, we cannot say that the trial court's denial of Rogers's Batson motion was clearly erroneous.
 II.
Rogers contends that the prosecutor improperly cross-examined him about his post-arrest silence. (Issue VI in Rogers's brief.) Specifically, Rogers contends that the prosecutor's cross-examination violated the United States Supreme Court's holding in Doyle v. Ohio, 426 U.S. 610
(1976). In Doyle, the Supreme Court held that the use of a defendant's post-arrest, post-Miranda silence for impeachment purposes violates the Due Process Clause of the Fourteenth Amendment.
Rogers testified on his own behalf at trial. He asserted that he had acted in self-defense and/or in the defense of his brother when he shot and killed Angelo Gordon and Michael Davis and injured Carlos Taylor. Rogers testified that he feared for his life and his brother's life when he saw his brother and Gordon fighting. Rogers testified that he did not pull *Page 651 
out his gun and shoot until he saw that Gordon was holding a gun. Rogers also stated that he fled the scene immediately after the shooting (which occurred on a Thursday evening) and that he stayed in a hotel through the weekend until he turned himself in to the police on Monday. Rogers stated that his counsel had advised him to wait through the weekend before turning himself in. In response to defense counsel's questioning, Rogers further stated that he was testifying at trial because he wanted the jury to hear his side of the story, which he described as "the truth." (R. 314.) On cross-examination, the following occurred:
 "[Prosecutor]: Sir, did you make any effort on that evening to tell this detective after you fired those two shots about what the truth was?
"[Rogers]: No, ma'am.
 "[Prosecutor]: Did you make any effort to tell any other police officer or person in authority what the truth was?
"[Rogers]: No, ma'am.
 "[Prosecutor]: And up until November of this past year [during Rogers's first trial, which ended in a mistrial], that's the first time, is it not, the first time you made any effort to tell anybody about what you claim the truth is, correct?
"[Rogers]: I was advised not to say anything.
 "[Prosecutor]: My question is, November of 1999, is that the first time you made any effort to tell anybody in a position of authority, a police officer, about what you claim the truth is?
 "[Rogers's counsel]: Judge, I think that's trying to impose some kind of duty on him which he does not have, and that's a comment against his first [sic] amendment privileges.
"The Court: Overruled.
 "[Rogers]: No, I didn't say anything until November 15, 1999, last trial."
(R. 315-16.) Later during cross-examination, the prosecutor questioned Rogers about his direct testimony that he had thrown the gun he had used in the shooting into a river:
 "[Prosecutor]: And you never made any effort to tell anyone up until November that you had thrown the evidence away and into the river; is that correct?
"[Rogers]: I told my lawyer.
 "[Rogers's counsel]: Judge, this has been gone into. It's been asked and answered by him when she first started.
"The Court: Overruled.
 "[Prosecutor]: Let me repeat the question. You never made any effort until November of 1999 to let anybody in any position of authority know that you had thrown the gun, the evidence, into the river?
 "[Rogers's counsel]: Judge, again, I would make the same objection. There is no burden or duty for him to do that.
"The Court: Overruled.
 "[Rogers]: Yes, I told my lawyer before that, before the trial, before it even came in.
"[Prosecutor]: You told your lawyer that?
"[Rogers]: Yes.
"[Prosecutor]: Did you ever tell any police officer?
"[Rogers]: No, because I was advised to keep silent.
"[Prosecutor]: Okay. You told nobody?
"[Rogers]: No one."
(R. 330-31.)
We do not believe this issue was properly preserved for review. Although Rogers's counsel objected to the *Page 652 
prosecutor's questions, he did not object until after Rogers had answered the prosecutor's first three questions regarding whether he had told anyone "what the truth was" before his first trial in November 1999. "`An objection to a question, made after an answer is given, is not timely and will not preserve the issue for review.'" Roper v. State, 695 So.2d 244,246 (Ala.Crim.App. 1996), cert. denied, 695 So.2d 249 (Ala. 1997), quoting Scott v. State, 624 So.2d 230, 234 (Ala.Crim.App. 1993). See alsoEx parte Crymes, 630 So.2d 125, 127 (Ala. 1993) (holding that "[a] proper objection must be made after the question calling for objectionable testimony is asked and before the witness answers").
Moreover, even assuming that this issue was properly preserved for review, we find no error. As the State correctly points out in its brief to this Court, the prosecutor's first two questions related to Rogers's actions on the night of the crimes, before he turned himself in to the police the following week. There is no prohibition against impeaching a testifying defendant with his prearrest silence. See Jenkins v.Anderson, 447 U.S. 231, 240 (1980) ("impeachment by use of prearrest silence does not violate the Fourteenth Amendment"). See also Ex partePippens, 621 So.2d 961, 963 (Ala. 1993) (holding that prosecutor could question defendant on cross-examination about defendant's prearrest silence). In addition, this is not a case involving evidence of a prearrest tacit admission. See, e.g., Pippens, supra; and Ex parte Marek,556 So.2d 375, 380 (Ala. 1989). Therefore, the prosecutor's questioning of Rogers regarding his prearrest silence was proper.
We also find that the prosecutor's remaining questions regarding Rogers's silence from the time he turned himself in to police until his first trial in November 1999 were proper. The prohibition against impeaching a testifying defendant with his postarrest silence does not apply where the jury has not been shown that the defendant's silence was preceded by Miranda warnings. In Fletcher v. Weir, 455 U.S. 603 (1982), the United States Supreme Court limited its holding in Doyle as follows:
 "In the absence of the sort of affirmative assurances embodied in the Miranda warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand. A State is entitled, in such situations, to leave to the judge and jury under its own rules of evidence the resolution of the extent to which postarrest silence may be deemed to impeach a criminal defendant's own testimony."
455 U.S. at 607. "`[T]he key to the exclusionary rule of Doyle is the giving of Miranda warnings.'" Kidd v. State, 649 So.2d 1304, 1307
(Ala.Crim.App. 1994), quoting Sulie v. Duckworth, 689 F.2d 128, 132 n. 1 (7th Cir. 1982) (Cudahy, J., dissenting), cert. denied, 460 U.S. 1043
(1983). The adverse use of a defendant's silence in the absence ofMiranda warnings is permitted. See, e.g., Gainer v. State, 553 So.2d 673,683 (Ala.Crim.App. 1989). In this case, nothing in the record suggested that Rogers was given his Miranda rights after he turned himself in to police or at any time thereafter, and Rogers makes no such assertion in his brief to this Court. Therefore, the State's questioning of Rogers regarding his silence was proper.
 III.
Rogers contends that the trial court erred in denying his motion for a mistrial on the ground of juror misconduct. *Page 653 
(Issue IV in Rogers's brief.) The record reflects that on the morning of the third day of trial, after closing arguments had concluded and just before the trial court's jury instructions, the following occurred, outside the presence of the jury:
 "The Court: One of the jurors advised my judicial assistant that another of the jurors, apparently, [R.W.], although we're not sure about that — told them yesterday that he noted from the newspaper that the defendant had been in a previous trial which was mistried and what did they think about that.
 "It is my thought that what we need to do, assuming that it is [R.W.], or even if it isn't, excuse that juror and then instruct the remaining jurors that that has absolutely nothing to do with this case and attempt to obtain from them their agreement that they can try the case without being influenced by that.
"What does the State have to say?
 "[Prosecutor]: Your Honor, I think that that's the only thing we can do. I assume you're going to call [R.W.] out here and ask him about that, just him, and find out if in fact he did say that.
 "The Court: What we first need to do, I think, is talk to the juror that reported the matter and make sure this is who it is.
 "[Prosecutor]: Yes. And I think, perhaps, you also — we may need to ask each one of them individually. I don't know if asking them in a group —
"The Court: Well, what does the defendant have to say?
 "[Rogers's counsel]: Judge, obviously, I'd like to talk to my client about it. He's on his way up. But I note that [R.W.] is an alternate.
 "The Court: He would have been the first alternate, anyway.
 "[Rogers's counsel]: He would have been leaving anyway, so I don't think there's any prejudice to me by him being released from the jury. But I would ask the Court to, maybe, address individually the gentleman that has forwarded this information to the Court to see how many of them heard it and what was any reaction out of who heard it. I'm not sure if that prejudices me or not. I don't know if I'm asking for a mistrial based on that or not yet. I have to talk to my client about it.
"The Court: I understand.
 "[Prosecutor]: Is [R.W.] the one it was said to or —
 "The Court: Is supposed to be the one who communicated the matter to some or all of the remaining jurors.
"[Prosecutor]: Judge, I would also note that, you know
 — of course, I may be speaking from an appellate court point of view, but throughout the trial I think the jury knew there was another trial because it was mentioned, even though we —
 "The Court: Well, we made our best efforts to talk about other proceedings, this, that, and the other.
 "[Prosecutor]: The defendant got up there and said —
 "The Court: One of the witnesses actually said `another trial.'
 "[Prosecutor]: The defendant got up there and said several times `my last trial.'
 "[Rogers's counsel]: I think there were people from both sides that referenced trial instead of proceedings or hearing. I think that was disguised as much as possible, but I don't think it was.
 "The Court: Well, it is my belief that the matter does not rise to the level, depending on what the jurors say, of grounds upon which the Court would *Page 654 
 grant a mistrial. But you talk to your client and then we'll see."
(R. 437-39.) When the jury returned, the trial court excused the two alternate jurors, including R.W. The trial court then instructed the jury as follows:
 "The Court: Now, the other thing, I suspect you picked this up in the course of the trial even if one of your fellows had not mentioned it to you, but I understand that some mention was made, apparently, by [R.W.] of the fact that there has been a previous trial in this case. That is so.
 "However, it has absolutely nothing to do with the conduct of this proceeding. This is a brand new trial from the beginning, and it is to be considered — is considered by the Court and should be considered by you as the initial proceeding in the case. Nothing that's gone on before has any effect on the outcome of this. And the fact that there may have been previous proceedings in the case should in no way, and cannot in any way influence your consideration of the matter here today.
 "Do any of you have any problem with that proposition? That is to say, is anybody in any way influenced by the fact that there may have been prior proceedings in the case, or would that in any way influence your ability to sit in fair and impartial judgment on this matter?
 "Let me ask you individually. Would it influence you in any way, sir?
"(Jury polled.)
 "The Court: Okay. Thank you all. I'll allow any party to put on the record as having been made as of this time any motions or comments that they may have concerning that matter."
(R. 441-43.) The trial court then gave its final instructions to the jury. After the conclusion of the court's oral charge, the following occurred:
 "The Court: All right. First, let's take up the matter of the discussion concerning the previous trial. What say the defendant?
 "[Rogers's counsel]: Judge, just for the record, as we discussed off the record, I think I'm left in an untenable position and I have to move for a mistrial based on potential prejudice to these jurors and to my client.
"The Court: All right. What does the State have to say?
 "[Prosecutor]: Your Honor, we would be opposed to a mistrial. I think that Your Honor has taken the necessary steps in order to assure that this jury can still sit and be fair and impartial. I believe the individual we discussed has been dismissed from the panel. He was an alternate, to begin with. And I don't think it rises to the level of granting a mistrial.
"The Court: All right. I deny the defendant's motion."
(R. 460.)
 "`A trial judge is allowed broad discretion in determining whether a mistrial should be declared, because he is in the best position to observe the scenario, to determine its effect upon the jury, and to determine whether the mistrial should be granted.' Dixon v. State, 476 So.2d 1236, 1240 (Ala.Crim.App. 1985). `A mistrial is an extreme measure and should be denied when the prejudicial quality of the comment [or incident] can be eradicated by curative instructions.' Walker v. State, 631 So.2d 294, 300 (Ala.Crim.App. 1993)."
Berryhill v. State, 726 So.2d 297, 302-303 (Ala.Crim.App. 1998). "`In cases involving juror misconduct, a trial court generally will not be held to have abused its discretion "where the trial court investigates the circumstances under which the remark *Page 655 
was made, its substance, and determines that the rights of the appellant were not prejudiced by the remark."'" Riddle v. State, 661 So.2d 274, 276
(Ala.Crim.App. 1994), quoting Holland v. State, 588 So.2d 543, 546
(Ala.Crim.App. 1991), quoting, in turn, Bascom v. State, 344 So.2d 218,222 (Ala.Crim.App. 1977). Furthermore,
 "`Whether vel non the reading of a newspaper article has influenced the jury to the detriment of appellant is a question to be determined by the trial court in the exercise of its sound discretion.' Williams v. State, 410 So.2d 911, 913 (Ala.Crim.App. 1982). Even when jurors read newspaper accounts of the case, a verdict will not be disturbed if the trial court determines that none of the jurors was affected by the article. Wiggins v. State, 429 So.2d 666
(Ala.Crim.App. 1983); Flowers v. State, 402 So.2d 1118
(Ala.Crim.App. 1981)."
Robinson v. State, 577 So.2d 928, 931 (Ala.Crim.App. 1990). See alsoBurell v. State, 680 So.2d 975 (Ala.Crim.App. 1996).
Here, the trial court obviously determined that none of the jurors would be influenced by their knowledge that Rogers's previous trial had ended in a mistrial. Although the trial court polled the jurors regarding whether their knowledge of Rogers's previous trial would influence them in any way, the results of that poll are not in the record. "`This Court cannot predicate error on matters not shown by the record nor can we presume error from a silent record. It is the appellant's duty to provide this Court with a complete record on appeal.'" Living v. State,796 So.2d 1121, 1140 (Ala.Crim.App. 2000), quoting Rutledge v. State,745 So.2d 912, 919 (Ala.Crim.App. 1999). Rogers did not argue at trial, nor does he argue on appeal, that any of the jurors indicated that the fact that a prior trial had resulted in a mistrial would influence them in any way. Furthermore, the record reflects that, despite efforts on the part of the trial court and the attorneys, there were several references to Rogers's "last trial" during the present trial, none of which Rogers objected to. Finally, the trial court thoroughly instructed the jury that the earlier trial had no bearing on the present trial and that the jury should not consider the earlier trial when making its decision in the present trial. Jurors are presumed to follow the trial court's instructions. See, e.g., Jackson v. State, 791 So.2d 979, 999
(Ala.Crim.App. 2000); and Taylor v. State, 666 So.2d 36, 70
(Ala.Crim.App. 1994), aff'd, 666 So.2d 73 (Ala. 1995), cert. denied,516 U.S. 1120 (1996).
Because the jurors were already aware of Rogers's previous trial before R.W. informed them about it, because nothing in the record suggests that Rogers was prejudiced by the jury's knowledge of the previous mistrial, and because the trial court thoroughly instructed the jury, we find no error in the trial court's denial of Rogers's motion for a mistrial.
 IV.
Rogers contends that the trial court erred in allowing the testimony of Victor Vaughn, a homicide detective with the Mobile Police Department, regarding a statement that his brother, Rudolph, had made in January 1998, after Angelo Gordon had shot him. (Issue I in Rogers's brief.) Specifically, Rogers complains about Detective Vaughn's testimony that Rudolph had told him that "somebody was gonna have to pay for shooting him." (R. 386.)
The record reflects that the State first attempted to elicit testimony about Rudolph's statement on direct examination of Detective Vaughn during its case-in-chief. The trial court, however, sustained Rogers's *Page 656 
hearsay objection. Later, during cross-examination of Rogers, Rogers stated that his brother was not upset about having been shot by Gordon. On rebuttal, the State then recalled Detective Vaughn to the witness stand. Rogers objected to Detective Vaughn's being recalled, arguing that any testimony regarding Rudolph's statement would be hearsay and that "there's no exception to the hearsay rule that gets around that." (R. 382.) The State argued that it was offering the statement to impeach Rogers's testimony that his brother was not upset about having been shot. The trial court overruled Rogers's hearsay objection and allowed Detective Vaughn to testify to the statement.
On appeal, Rogers does not argue that Rudolph's statement was hearsay. (In fact, Rogers concedes that the statement fell within the "then-existing-state-of-mind" exception to the hearsay rule, see Rule 803(3), Ala.R.Evid.) Instead, Rogers argues that the statement was inadmissible because, he says, Rudolph's state of mind in January 1998, some 13 months before the present incident, was irrelevant and because, he says, there was no evidence that Rudolph's feelings about being shot were ever communicated to Rogers. Neither of these arguments was presented to the trial court. "The statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial." Ex parte Frith,526 So.2d 880, 882 (Ala. 1987). See also Allen v. State, 659 So.2d 135
(Ala.Crim.App. 1994). Therefore, this issue is not properly before this Court for review.
 V.
Rogers contends that the trial court erred in denying his motion for a new trial. (Issue V in Rogers's brief.)
The record reflects that Rogers was sentenced on March 16, 2000. On April 12, 2000, Rogers filed his motion for a new trial, on the ground of juror misconduct. In the motion, Rogers argued that one of the jurors, L.E., lived next door to the family home of Sherry Claiborne, who was the girlfriend of one of Rogers's brothers, Michael Rogers. Rogers maintained that the relationship between L.E. and the Claibornes was "hostile" and that he did not discover the relationship until after the trial. (C. 87.) In addition, Rogers contended that Claiborne was present during the majority of his trial and that Claiborne "firmly believe[d]" that L.E. had recognized her during the trial. According to Rogers, he was prejudiced by L.E.'s acquaintance with the Claibornes. Rogers's motion was not verified and he submitted no affidavits in support of the motion.
On May 25, 2000, 70 days after Rogers was sentenced, the trial court held a hearing on Rogers's motion for a new trial, at which Rogers presented evidence in support of his claim. Following the hearing, the trial court denied the motion.
Rule 24.4, Ala.R.Crim.P., provides:
 "No motion for new trial or motion in arrest of judgment shall remain pending in the trial court for more than sixty (60) days after the pronouncement of sentence, except as provided in this section. A failure by the trial court to rule on such a motion within the sixty (60) days allowed by this section shall constitute a denial of the motion as of the sixtieth day; provided, however, that with the express consent of the prosecutor and the defendant or the defendant's attorney, which consent shall appear in the record, the motion may be carried past the sixtieth day to a date certain; if not ruled upon by the trial court as of the date to which the motion is continued, *Page 657 
 the motion is deemed denied as of that date, unless it has been continued again as provided in this section. The motion may be continued from time to time as provided in this section."
Nothing in the record indicates that the parties agreed to continue the hearing on Rogers's motion for a new trial past the 60-day period provided for in Rule 24.4. Therefore, Rogers's motion for a new trial was denied by operation of law on May 15, 2000, 60 days after he was sentenced. Because the motion was denied by operation of law on May 15, the trial court lacked jurisdiction to hold a hearing on May 25, 2000, and the trial court's order purporting to deny the motion after the hearing was "`a nullity . . . of no force and effect.'" Edgar v. State,646 So.2d 681, 683 (Ala.Crim.App. 1993), rev'd 646 So.2d 683
(Ala. 1994), (pertinet reasoning approved), quoting Box v. Box, 536 So.2d 83
(Ala.Civ.App. 1988). See also Similton v. State, 672 So.2d 1363
(Ala.Crim.App. 1995). Furthermore, "[a]ny testimony given at the . . . hearing likewise is of no consequence and cannot be considered by this court." Edgar, 646 So.2d at 683.
Because we cannot consider the evidence presented by Rogers at the hearing on his motion, the only document properly before this Court for consideration is Rogers's motion for a new trial. As noted above, Rogers's motion was not verified and there were no accompanying affidavits.
 "`"Assertions of counsel in an unverified motion for a new trial are bare allegations and cannot be considered as evidence or proof of the facts alleged."' Ingram v. State, 629 So.2d 800, 804
(Ala.Crim.App. 1993) (quoting Smith v. State, 364 So.2d 1, 14 (Ala.Crim.App. 1978)). Accord Arnold v. State, 601 So.2d 145, 154 (Ala.Crim.App. 1992); see also Similton v. State, 672 So.2d 1363 (Ala.Crim.App. 1995). `There is no error in a trial court's denial of a motion for new trial where no evidence is offered in support of that motion.' Arnold, 601 So.2d at 154. Furthermore, although the state did not answer the allegations in the motion for a new trial and although the motion was denied by operation of law, since the motion for a new trial is not supported by an affidavit or any other evidence and the grounds relied on in the motion are not shown by the record, `it is unnecessary for this court to reverse and remand this case to the trial court for a hearing on the appellant's allegations . . . contained in the motion for new trial.' Similton, supra, 672 So.2d at 1366; see Hill v. State, 675 So.2d 484 (Ala.Crim.App. 1995). The denial of the motion for a new trial is due to be upheld."
Smith v. State, 675 So.2d 100, 101 (Ala.Crim.App. 1995). Likewise, because Rogers's motion was unverified, no evidence was submitted in support of the motion, and the ground relied on is not supported by the record, we find no error in the fact that the motion for a new trial was denied by operation of law.
Moreover, even if this Court could consider the evidence Rogers presented at the hearing, we would still find no error in the denial of the motion for a new trial. "At a hearing on a motion for a new trial, the defendant has the burden of proving the allegations of his motion to the satisfaction of the trial court." Miles v. State, 624 So.2d 700, 703
(Ala.Crim.App. 1993). At the hearing, Sherry Claiborne testified that juror L.E. was her grandmother's next-door neighbor; that her grandmother's family and L.E.'s family have had "disputes" in the past; that her grandmother and L.E. now keep a "distant" relationship; that she and L.E. know each other by sight, but have never spoken; *Page 658 
and that L.E. looked at her several times during the trial when she was sitting with Rogers's family. Debra Bettis Thrash, Claiborne's aunt who lived with Claiborne's grandmother, testified that when she and her siblings were growing up in the 1960s and 1970s, they often fought with L.E. and his siblings and that because of these fights, the two families did not have a good relationship. Juror L.E. was not called to testify at the hearing and Rogers presented no evidence that L.E. recognized Claiborne during the trial or that, even if L.E. had recognized Claiborne, his relationship with Claiborne's grandmother might have influenced his verdict. Therefore, the trial court did not err in denying Rogers's motion for a new trial.
 VI.
Finally, Rogers contends that the trial court erred in refusing his requested jury instruction on heat-of-passion (provocation) manslaughter. (Issue III in Rogers's brief.)
During the charge conference, Rogers requested that the trial court instruct the jury on heat-of-passion manslaughter as a lesser-included offense of murder. Rogers argued that he was provoked into shooting Angelo Gordon and Michael Thomas when he saw his brother being assaulted by Gordon, the man who had shot and seriously wounded his brother the year before, and who, Rogers testified, was holding a gun. Recognizing that an instruction on heat-of-passion manslaughter may have been warranted under the circumstances of the case, the trial court requested Rogers's counsel to provide him with caselaw indicating that an instruction on heat-of-passion manslaughter is warranted if an accused witnesses an assault on a family member or relative. The following day, just before the court gave its oral charge, Rogers's counsel informed the court that he had found no caselaw on whether heat-of-passion manslaughter would be a lesser-included offense of murder under the facts of the present case. The trial court then denied Rogers's request to instruct the jury on heat-of-passion manslaughter.[1]
On appeal, Rogers contends that the trial court erred in denying his request for a charge on heat-of-passion manslaughter as a lesser-included offense of murder because, he says, evidence was presented that suggested that he was acting as the result of a sudden heat of passion, specifically, as the result of seeing his brother being assaulted by the man who had shot his brother 13 months earlier. We agree.
 "`A person accused of the greater offense has a right to have the court charge on the lesser offenses included in the indictment, when there is a reasonable theory from the evidence supporting his position. Chavers v. State, 361 So.2d 1106 (Ala. 1978); Fulghum v. State, 291 Ala. 71, 277 So.2d 886 (1973); Wiggins v. State, 491 So.2d 1046 (Ala.Crim.App. 1986); Wilkerson v. State, 486 So.2d 509 (Ala.Crim.App. 1986). A court may properly refuse to charge on a lesser included offense only when (1) it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense, or (2) the requested charge would have a tendency to mislead or confuse the jury. Lami v. State, 43 Ala. App. 108, 180 So.2d 279, cert. denied, 278 Ala. 710, 180 So.2d 282 (1965). Every accused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which are supported by any evidence, *Page 659 
 however weak, insufficient, or doubtful in credibility. Ex parte Stork, 475 So.2d 623 (Ala. 1985); Chavers v. State, supra; Burns v. State, 229 Ala. 68, 155 So. 561
(1934). Section 13A-1-9(b) provides, `The court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense.'
 "`"The `safer' practice is to charge upon all degrees of homicide: `(It) is much the safer rule to charge upon all degrees of homicide included in the indictment, when a party is on trial for murder, unless it is perfectly clear to the judicial mind that there is no evidence tending to bring the offense within some particular degree.' Pierson v. State, 99 Ala. 148, 153, 13 So. 550 (1893), approved in Williams v. State, 251 Ala. 397, 399, 39 So.2d 37
(1948)."
 "`Phelps v. State, 435 So.2d 158, 163 (Ala.Crim.App. 1983).'"
Williams v. State, 675 So.2d 537, 540-41 (Ala.Crim.App. 1996), quotingAnderson v. State, 507 So.2d 580, 582-83 (Ala.Crim.App. 1987). See alsoMcDowell v. State, 740 So.2d 465 (Ala.Crim.App. 1998).
Section 13A-6-3(a)(2), Ala. Code 1975, provides: "A person commits the crime of manslaughter if . . . [h]e causes the death of another person under circumstances that would constitute murder under Section 13A-6-2; except, that he causes the death due to a sudden heat of passion caused by provocation recognized by law, and before a reasonable time for the passion to cool and for reason to reassert itself."
 "`[Section] 13A-6-3(a)(2) is designed to cover those situations where the jury does not believe a defendant is guilty of murder but also does not believe the killing was totally justified by self-defense.' Shultz v. State, 480 So.2d 73, 76 (Ala.Crim.App. 1985). See also Shiflett v. State, 507 So.2d 1056
(Ala.Crim.App. 1987).
 "`To constitute adequate legal provocation, it must be of a nature calculated to influence the passions of the ordinary, reasonable man. Other than discovered adultery, courts have reached different conclusions as to what factual situations are embraced within this doctrine. See Commentary, § 13A-6-3, Code of Alabama 1975. See also Annot., 93 A.L.R.3d 920 (1979).'
"Biggs v. State, 441 So.2d 989, 992 (Ala.Crim.App. 1983)."
Williams, 675 So.2d at 541.
In Vaughan v. State, 201 Ala. 472, 78 So. 378 (1918), the Alabama Supreme Court held that witnessing an assault on a family member or relative may constitute sufficient provocation to warrant a jury instruction on heat-of-passion manslaughter. In that case, the accused witnessed his father being assaulted and, according to his testimony at trial, shot and killed the victim only after the victim had struck his father. In holding that the trial court had erred in not instructing the jury on heat-of-passion manslaughter, the Alabama Supreme Court stated:
 "The question is presented for determination here as to whether or not the facts and circumstances of this case call for instructions by the court to the jury upon manslaughter in the first degree. This we consider the question of prime importance on this appeal.
 "`Whether or not the homicide is the offspring of malice is the characteristic which distinguishes murder and manslaughter. In consideration of the infirmities of humanity, the law regards a *Page 660 
 sudden transport of passion, caused by adequate provocation, as sufficient to rebut the imputation of malice which would otherwise arise. In such case, the law imputes the homicide to inherent frailty, instead of malice, or formed design. . . . A killing in sudden passion, excited by sufficient provocation, without malice, is manslaughter.' Reeves v. State, 186 Ala. 14, 65 So. 160.
 "`The distinction between murder and voluntary manslaughter is found in the dividing line between malicious action on the one hand and action in the heat of passion on the other. Malice and heat of passion cannot coexist. Again, voluntary manslaughter differs from homicide which the law deems excusable because committed in self-defense in that in the one case there is an apparent necessity for self-preservation to kill the aggressor, and in the other no necessity at all.' 13 R. C. L. 786; State v. Roberts, 8 N.C. 349, 9 Am. Dec. 643.
 "`A killing in sudden passion excited by sufficient provocation, without malice, is manslaughter, "not because the law supposes that this passion made him [the slayer] unconscious of what he was about to do, and stripped the act of killing of an intent to commit it, but because it presumes that passion disturbed the sway of reason, and made him regardless of her admonitions. It does not look upon him as temporarily deprived of intellect, and therefore not an accountable agent, but as one in whom the exercise of judgment is impeded by the violence of excitement and accountable therefor as an infirm human being."' Smith v. State, 83 Ala. 26, 3 So. 551.
 "The case of Smith v. State, supra, is cited in note to Johnson v. State, 9 Ann. Cas. 923, where are to be found several authorities bearing upon the question of the extent of mental disturbance, essential to passion, which may reduce felonious killing to manslaughter. See, also, Martin v. State, 119 Ala. 1, 25 So. 255.
 "Much discussion of the question here under consideration is found in Commonwealth v. Paese, 220 Pa. 371, 69 A. 891, 17 L.R.A. (N.S.) 795, 123 Am. St. Rep. 699, 13 Ann. Cas. 1081, and in the note thereto several authorities collected which are of interest in this connection. In that case the court recognized that a violent assault, or serious injury, to a near relative in the immediate presence of the defendant may be sufficient provocation to cause sudden passion to the extent of reducing the degree of homicide to that of manslaughter. The following excerpts from that opinion are here pertinent:
 "`What is sufficient provocation for this purpose has not been exactly defined, and is probably incapable of exact definition, for it must vary with the myriad shifting circumstances of men's temper and quarrels. It is a concession to the infirmity of human nature, not an excuse for undue or abnormal irascibility, and, therefore, to be considered in view of all the circumstances. . . . On the other hand, certain circumstances have been held to be sufficient provocation. Thus, in general, serious injury immediately inflicted or threatened, to wife (or husband), child or servant will, on account of the relationship of the parties, reduce the killing to manslaughter in similar cases as if the injury had been to self.'
 "In the note to this case the author makes the following observation:
 "`The reported case draws a distinction between a homicide committed by a friend of the person killed or *Page 661 
 assaulted and a homicide committed by a relative of such person. On account of the relationship of the parties, it is usually held that the killing or assaulting of a near relative is a provocation legally sufficient to produce passion, which reduces to manslaughter a murder committed by a person while he is incapable of cool reflection.'
 "A number of cases are there cited by the author in support of this statement, together with the following quotation from Guffee v. State, 8 Tex. Ct. App. 187:
 "`Certainly, to one at all familiar with the promptings of the human heart and the motives by which men are governed in their resentments and affections, it cannot be a matter of serious question that the death of a brother by the violence of another, in the immediate presence of one, is better calculated to produce in a person of ordinary temper, a greater degree of anger, rage, or resentment, than any of the causes particularly designated in the statute, and that such an occurrence is amply sufficient to render the mind incapable of cool reflection.'
 "The question was squarely presented in the case of Pearce v. State, 4 Ala. App. 32, 58 So. 996, and that authority was cited with approval by this court in Reeves v. State, supra. In the Pearce case it was said:
 "`It is not our understanding of the law that if a man provokes a difficulty, and then afterwards is forced, by an unanticipated deadly assault of his adversary, to take his adversary's life to protect his own, such a man is as [a] matter of law necessarily guilty of murder in one of its degrees, and not of manslaughter in the first degree.'
 "We are of the opinion that under the evidence in this case it was for the jury to say whether or not the fatal shot was fired by the defendant in a sudden passion excited by sufficient provocation upon seeing his father struck to the ground. Pearce v. State, supra; Wharton on Homicide (2d Ed.) § 446, and authorities supra."
201 Ala. at 474-75, 78 So. at 380-81. (Emphasis added.)
This case falls squarely within the Alabama Supreme Court's holding inVaughan. Rogers testified that when he first noticed the fight, he saw his brother on the ground and that Angelo Gordon and several other people were on top of him. According to Rogers, Gordon was holding a gun. Rogers testified that he knew that Gordon had shot and seriously wounded Rudolph some 13 months earlier; that he had purchased a gun shortly after Rudolph had been shot to protect himself from Gordon; and that he fired at Gordon only because he saw Gordon on top of his brother holding a gun. Rogers's testimony, if believed, would have permitted the jury to find that Rogers was guilty of heat-of-passion manslaughter, rather than murder, with respect to the deaths of both Angelo Gordon and Michael Davis. See, e.g., Carter v. State, [Ms. CR-98-1976, August 31, 2001] ___ So.2d ___ (Ala.Crim.App. 2001) (recognizing that through the doctrine of transferred intent, not only does an accused's intent transfer from the intended victim to an unintended victim, but so does the degree of the crime). The question whether Rogers shot and killed Angelo Gordon and Michael Davis because of a sudden passion caused by seeing his brother Rudolph engaged in a fight with Gordon, seeing Gordon with a gun, and knowing that Gordon had shot and seriously injured Rudolph the year before, was a question for the jury. Therefore, we hold that, under the circumstances of this case, the trial court erred in not instructing the *Page 662 
jury on heat-of-passion manslaughter as a lesser included offense of murder.
We note that recent cases of this Court have suggested that Alabama recognizes only two legal provocations sufficient to reduce murder to manslaughter: (1) when the accused witnesses his or her spouse in the act of adultery and (2) when the accused is assaulted or faced with an imminent assault. See, e.g., McGriff v. State, [Ms. CR-97-0179, September 29, 2000] ___ So.2d ___ (Ala.Crim.App. 2000); Living v. State,796 So.2d 1121 (Ala.Crim.App. 2000); Turner v. State, 708 So.2d 232
(Ala.Crim.App. 1997); and Hill v. State, 699 So.2d 974 (Ala.Crim.App. 1997). To the extent that those cases have limited heat-of-passion manslaughter to only those two situations, they were in error. Alabama courts have, in fact, recognized three legal provocations sufficient to reduce murder to manslaughter: (1) when the accused witnesses his or her spouse in the act of adultery; (2) when the accused is assaulted or faced with an imminent assault on himself; and (3) when the accused witnesses an assault on a family member or close relative.
Because the trial court should have instructed the jury on heat-of-passion manslaughter as a lesser-included offense with respect to the two murder charges, we must reverse Rogers's two convictions for the murders of Angelo Gordon and Michael Davis. Rogers's conviction for the attempted murder of Carlos Taylor, however, is affirmed. Rogers did not request a jury instruction on attempted heat-of-passion manslaughter; therefore, we need not reach the issue whether attempted heat-of-passion manslaughter is an offense in Alabama. See Westbrook v. State,722 So.2d 788 (Ala.Crim.App. 1998) (where Judges McMillan and Brown stated that there is no offense of attempted manslaughter in Alabama; Presiding Judge Long concurred in the result; and Judges Cobb and Baschab dissented); and Stennet v. State, 564 So.2d 95 (Ala.Crim.App. 1990).
Rogers's conviction for attempted murder is affirmed, and his two convictions for murder are reversed. The case is remanded for proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
McMillan, P.J., and Cobb and Wise, JJ., concur. Baschab, J., dissents, without opinion.
[1] The trial court did charge the jury on reckless manslaughter.